**EXHIBIT A**

## LOAN AND SECURITY AGREEMENT

LOAN AND SECURITY AGREEMENT (the "**Agreement**"), dated as of December [**20**], 2013, by and among First 100, LLC, a Nevada limited liability company ("**Borrower**"), and Colgan Financial Group, Inc., a Connecticut corporation (collectively, "**Lender**").

### RECITALS:

WHEREAS, Lender has agreed to make a bridge loan ("**Loan**") to Borrower, to be represented by a short term original issue discount note, which note shall be issued in the aggregate amount of $750,000 and which note shall be redeemed by the Borrower in the aggregate amount of $1,650,000, for the purpose of providing bridge financing to allow Borrower to pay the purchase price for certain assets held by Association of Poinciana Villages, Inc. ("**Seller**"), a homeowner's association, pursuant to Purchase and Sale Agreement, dated July 3, 2013, between Borrower and Seller ("**Poinciana Purchase Agreement**"), to pay certain expenses associated with the Poinciana Purchase Agreement and to pay the expenses of Lender pursuant to this Agreement; and

WHEREAS, Borrower has procured a loan facility in the amount of $60,000,000 with an entity affiliated with Platinum Partners, or any other financing with any third party (a "**Loan Facility**"), provided that Borrower completes, among other things, a reorganization ("**Reorganization**") that will, in part, result in the creation of a holding company, 1st One Hundred Holdings, LLC ("**Holdings**"); and

WHEREAS, Borrower and Lender desire to enter into this Agreement which sets forth the terms and conditions of the Loan.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

### ARTICLE I
### LOAN DOCUMENTS; LENDER'S EXPENSES; CLOSING

1.1     Loan Documents.

(a) The Loan shall be reflected by a Short Term Original Discount Promissory Note, substantially in the form attached hereto as **Exhibit A** (the "**Promissory Note**"), issued by Borrower to Lender in the principal amount of $750,000 to be redeemed by the Company in the aggregate amount of $1,650,000. Monthly payments of principal (which incorporates interest on the Loan) will be made as follows (i) $750,000 shall be paid on the earlier of February [20], 2014 or the date of the closing of the Loan Facility, and (ii) $150,000 on each of January 20, 2014, February 20, 2014, March 20, 2014, April 20, 2014, May 20, 2014, with a final payment due on June 20, 2014 ("**Maturity Date**"). Borrower at its option may prepay this Note prior to the Maturity Date in whole, but not in part, and shall in all events satisfy in full the outstanding obligations under this Note upon closing of the Loan Facility. In connection with any payment of this Note prior to the Maturity Date (including for clarity any prepayment or payment in connection with the closing of the Loan Facility), Borrower shall pay to Lender any outstanding balance of the Face Amount in accordance with the Promissory Note.

(b) Guarantees.   Mr. Jay Bloom and Mr. Matthew Farkas (each, an "**Individual Guarantor**"), each an officer and/or member of Borrower, shall guaranty the obligations under the Promissory Note and this Agreement, substantially in the form of the individual Guaranty attached hereto

as **Exhibit B** ("**Individual Guarantees**"). In addition, upon the closing of the Loan Facility, Holdings ("**Entity Guarantor**" and together with the Individual Guarantors, the "**Guarantors**"), shall guaranty the obligations under the Promissory Note and this Agreement, substantially in the form provided by Lender prior to such closing.

    1.2    Reimbursement of Lender's Expenses. In addition to, and without limiting, Borrower's obligation to pay or reimburse Lender for any fees or expenses pursuant to any other provision in the Loan Documents (as defined below), Borrower shall reimburse Lender's counsel, Levett Rockwood P.C., its fees (up to $10,000) and expenses in connection with the transactions contemplated hereby.

    1.3    Closing.

    (a) Closing of this Agreement. Subject to the terms and conditions hereof, Lender shall have no obligation to advance the Loan until each of the following conditions have been satisfied:

    (i)    Borrower shall execute and deliver to Lender this Agreement and the Promissory Note;

    (ii)    each Guarantor shall execute and deliver to Lender an Individual Guaranty.

    (iii)    Borrower shall pay to Lender the fees and expenses of Lender' counsel.

    (iv)    UCC-1 Financing Statement naming Lender as secured party and Borrower as debtor shall have been filed with the Nevada Secretary of State, in form and substance satisfactory to Lender.

    (v)    Borrower shall deliver a Secretary's Certificate to Lender, certifying as to the attached operating agreement and other organizational documents and resolutions duly adopted by its Board of Managers or other governing body authorizing the transactions contemplated by this Agreement and the Loan Documents.

    (vi)    UCC searches, tax lien and litigation searches against Borrower and each Guarantor shall be provided to Lender, and the results of such searches shall be satisfactory to Lender in their sole discretion.

    (vii)    if requested by Lender, Borrower shall provide Lender with certificates of insurance, naming Lender as loss payee and/or additional insured, as appropriate.

    (viii)    Borrower shall provide such additional information, materials and documents as Lender may reasonably request, in connection with the consummation of the transactions contemplated by this Agreement.

The Closing (the "**Closing**") of the transactions contemplated hereby shall occur upon completion of each of the conditions set forth above and shall be effective as of the date of this Agreement.

# ARTICLE 2
## SECURITY INTEREST

2.1 <u>Security</u>. The Secured Obligations (defined in Section 2.2 below) shall be secured as follows:

Borrower hereby grants, assigns and pledges to Lender a security interest in the following described property and interests in property, together with all proceeds thereof (collectively, the "<u>Collateral</u>"):

(i) <u>Equipment</u>. All machinery and equipment, all data processing and office equipment, all computer equipment, hardware and firmware, all furniture, fixtures, appliances and all other goods of every type and description, whether now owned or hereafter acquired and wherever located, together with all parts, accessories and attachments and all replacements thereof and additions thereto.

(ii) <u>Inventory</u>. All inventory and goods of Borrower, whether held for lease, sale or furnishing under contracts of service, all agreements for lease of same and rentals therefrom, whether now in existence or owned or hereafter acquired and wherever located.

(iii) <u>General Intangibles</u>. All rights, interests, choses in action, causes of action, claims and all other intangible property of Borrower of every kind and nature, in each instance whether now owned or hereafter acquired, including, but not limited to, all corporate and business records; all loans, royalties, and other obligations receivable; all trade secrets, inventions, designs, patents, patent applications, registered or unregistered service marks, trade names, trademarks, copyrights and the goodwill associated therewith and incorporated therein, and all registrations and applications for registration related thereto; goodwill, licenses, permits, franchises, customer lists and credit files; all customer and supplier contracts, firm sale orders, rights under license and franchise agreements, and other contracts and contract rights; all right, title and interest under leases, subleases, licenses and concessions and other agreements relating to real or personal property and any security agreements relating thereto; all rights to indemnification; all proceeds of insurance of which Borrower is a beneficiary; all letters of credit, guarantees, liens, security interests and other security held by or granted to Borrower; and all other intangible property, whether or not similar to the foregoing; and all products and all books and records related to any of the foregoing.

(iv) <u>Cash; Accounts, Chattel Paper, Instruments, Securities and Documents</u>. All Borrower's cash, accounts, accounts receivable, chattel paper, deposit accounts, instruments, investment property, letters of credit or rights with respect to any letters of credit, securities accounts, shares of stock and other securities, and documents, whether now in existence or owned or hereafter acquired, entered into, created or arising, and wherever located.

(v) <u>Other Property</u>. All property or interests in any other property now owned or hereafter acquired by Borrower.

The security interest granted to Lender hereunder shall be a first priority lien, subject to no other liens or security interests .

This Agreement, together with the Promissory Note, the Guarantees, any other document executed in connection herewith, and any and all amendments and modifications thereof, are referred to in this Agreement as the "**Loan Documents**".

2.2    Secured Obligations.   Without limiting any of the provisions thereof, this Agreement secures:

(a)    The full and timely payment of the indebtedness evidenced by the Promissory Note, together with interest thereon and other fees and expenses payable thereby, and any extensions, modifications, consolidations, and/or renewals thereof;

(b)    The full and prompt performance of all of the obligations of Borrower to Lender under the Loan Documents; and

(c)    The full and prompt payment of all court costs, and other expenses and costs of whatever kind incident to the collection of the indebtedness evidenced by the Promissory Note, the enforcement or protection of the security interests created by this Agreement or the exercise by Lender of any rights or remedies of Lender with respect to the indebtedness evidenced by the Promissory Note, including, without limitation reasonable attorneys' fees incurred by Lender (including without limitation reasonable attorneys' fees incurred by Lender in connection with the amendment, modification, and/or waiver of any rights available to Lender pursuant to this Agreement), all of which Borrower agrees to pay to Lender upon demand.

All of the foregoing indebtedness and other obligations are collectively referred to in this Agreement as the "**Secured Obligations**".

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower hereby represents and warrants to Lender as follows:

3.1    Status of Borrower.   Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada, and has the power to own and operate its properties, to carry on its business as now conducted and to enter into and to perform its obligations under this Agreement and the other Loan Documents to which it is a party.  Borrower is duly qualified to do business and is in good standing in each state in which it is doing business.

3.2    Authorization; Consents.   Borrower has full legal right, power and authority to enter into and perform its obligations under the Loan Documents to which it is a party, without the consent or approval of any third party.  The execution and delivery of this Agreement, the borrowing hereunder, the execution and delivery of each Loan Document to which Borrower is a party, and the performance by Borrower of its obligations hereunder and thereunder do not and will not contravene or conflict with any provision of law, any applicable judgment, ordinance, regulation or order of any court or governmental agency, the operating agreement or other organizational documents of Borrower, or any agreement binding upon it or its properties.

3.3    Validity and Binding Effect.   This Agreement and the other Loan Documents to which Borrower is a party are the legal, valid and binding obligations of Borrower enforceable in accordance with their terms, subject to the effect of bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect generally affecting creditors' rights and to the effect on enforceability of certain remedies of rules of law governing specific performance, injunctive relief and other equitable remedies.

3.4     Affiliates.  Borrower has no subsidiaries or any direct or indirect ownership interests in any person or entity, other than Holdings (to be established) and 1st One Hundred Investment Pool #1, LLC, each Nevada limited liability companies (the "**Affiliates**").  Other than in connection with the Loan Facility or as otherwise disclosed to Lender in writing, Borrower has no obligation to issue any additional equity interests in Borrower or its affiliates.

3.5     Litigation.  There are no actions, suits or proceedings pending or, to the knowledge of Borrower, threatened, against or affecting Borrower, the Affiliates or any Guarantor or involving the validity or enforceability of any of the Loan Documents or the priority of the liens thereof, at law or in equity, or before any governmental or administrative agency; and Borrower is not in default with respect to any order, writ, injunction, decree or demand of any court or any governmental authority.

3.6     Title to Property.  Borrower owns no real property.  Borrower has good and marketable title to all of the personal property used in its business, free and clear of any and all claims, liens, encumbrances, equities and restrictions of every kind and nature whatsoever other than the liens granted pursuant to the terms of this Agreement.  Lender's security interest as set forth herein shall be a first priority lien, subject to no other liens or security interests.

3.7     Compliance With Law.  Borrower has obtained all licenses, permits and governmental approvals and authorizations necessary or proper in order to conduct its business and affairs as heretofore conducted and as hereafter intended to be conducted.  Borrower is in compliance with all laws, regulations, decrees and orders applicable to it.

3.8     Finders and Brokers.  Borrower has not retained any finder or broker in connection with the transactions contemplated by this Agreement and Borrower agrees to indemnify and to hold Lender harmless of and from any liability for any commission or compensation in the nature of a finder's fee to any broker or other person or firm (and the costs and expenses of defending against such liability or asserted liability) for which Borrower, Guarantors, the Affiliates or any of their respective employees or representatives are responsible.

3.9     Survival.  The representations and warranties of Borrower contained in this Agreement will survive until the Secured Obligations are indefeasibly repaid and satisfied in full.

## ARTICLE IV
## COVENANTS OF BORROWER

4.1     Payment of Secured Obligations.  Borrower will pay the indebtedness evidenced by the Promissory Note according to the terms thereof, and will timely pay or perform, as the case may be, all the other Secured Obligations.  Without limiting the generality of the foregoing, Borrower shall pay in full all obligations under the Promissory Note and Loan Documents upon the Maturity Date.  Borrower will obtain the written approval of the lender providing the Loan Facility to the obligations of Borrower, the Affiliates and the Guarantors under the Loan Documents prior to the closing of the Loan Facility, including, without limitation, the obligation to make the payments described in the Promissory Note on the dates that such payments become due.  In addition, prior to the closing of the Loan Facility, Borrower shall provide Lender with a complete set of documents evidencing the Loan Facility.

4.2     Further Assurances.  At Borrower's expense, Borrower will take all actions requested by Lender to create and maintain for the benefit of Lender valid liens upon, security titles to and/or perfected security interests in any Collateral now or hereafter held by or for Lender, including, without limitation, the execution, delivery, filing and recordation of UCC-1 Financing Statements in a form satisfactory to

Lender and any such actions as determined by Lender to protect its interests as set forth in this Agreement.

      4.3  <u>Use of Proceeds; Limitations on Debt and Obligations.</u>

         (a)    <u>Use of Proceeds.</u>  Borrower shall use the proceeds of the Loans solely to pay the purchase price under the Poinciana Purchase Agreement, any expenses associated therewith and expenses associated with the Loan Documents, provided that any.

         (b)    <u>Indebtedness.</u>  Other than the Loan Facility, neither Borrower nor any Affiliate shall do (either directly or indirectly through any affiliate) any one or more of the following other than with respect to the Secured Obligations: create any Indebtedness (as defined below); incur or otherwise become obligated on any Indebtedness; assume any Indebtedness; refinance any Indebtedness; suffer to exist any Indebtedness against it; or draw upon any Indebtedness  For the purposes of this Agreement, "<u>Indebtedness</u>" means all indebtedness, obligations and liabilities for money borrowed, all indebtedness for the acquisition of property, all indebtedness secured by any lien on the property whether or not such indebtedness is a personal obligation, all liability by way of endorsements (other than for collection or deposit of negotiable instruments in the ordinary course of business), all capitalized leases, all synthetic leases and all other items, including contingent obligations, which in accordance with generally accepted accounting principles ("<u>GAAP</u>") are classified as liabilities on a balance sheet.

         (c)    <u>Liens.</u>  Without the prior written consent of Lender, neither Borrower nor any Affiliate will create, incur, assume or suffer to exist any lien, security interest, claim or encumbrance upon or with respect to any of its assets, now owned or hereafter acquired other than those in favor of Lender or with respect to Holdings, the lender providing the Loan Facility at the time of the closing of such facility.

         (d)    <u>Prohibition on Guarantees.</u>  From and after the date hereof, Borrower shall not guarantee (directly or indirectly through an affiliate) any obligations or commitments of any third party.

         (e)    <u>Capital Expenditures.</u>  Borrower will not make or incur any capital expenditures without the prior written consent of Lender.

      4.4    <u>Transfer of Collateral.</u>  Borrower will not sell, exchange, lease, negotiate, pledge, assign or otherwise dispose of the Collateral to anyone other than Lender, other than sales of inventory in the ordinary course of business.

      4.5    <u>Financial Statements and Reports.</u>  As soon as available, but in any event within fifteen (15) days of the end of each calendar month, Borrower shall provide Lender with a balance sheet of Borrower and its Affiliates as of the close of such month, an income statement of Borrower and its Affiliates for such month and a statement of cash flows for Borrower for such month, in reasonable detail, and prepared on the basis of GAAP, consistently applied.  In addition, Borrower shall provide with reasonable promptness, such other financial data and operating information as Lender may reasonably request from time to time, including without limitation status reports on the closing of the Loan Facility and the Reorganization.

      4.6    <u>Insurance.</u>  Borrower will maintain insurance against such hazards with such insurance companies and in at least such amounts as are customary in the business of Borrower and the Affiliates. Upon request of Lender, Borrower will deliver a certificate specifying the details of such insurance in effect and that Lender are a loss payee or additional insured, as appropriate, with respect to any such insurance.

4.7    Existence.  Borrower will maintain and will cause its Affiliates to maintain its existence and good standing in the State of Nevada and its qualification and good standing as a foreign corporation in each jurisdiction in which such qualification is required by applicable law.  Borrower will notify Lender at least thirty (30) days immediately prior to the formation of any subsidiary or other affiliate after the date hereof and, in the event of such formation, unless otherwise agreed by Lender, Borrower will cause (a) such subsidiary or other affiliate to guaranty the Secured Obligations, and (b) not to incur any Indebtedness except pursuant to the Loan Facility.

4.8    Maintenance of Books and Records of Borrower; Inspection.  Borrower will and will cause each Affiliate to maintain its books, accounts and records on the basis of GAAP accounting principles consistently applied, and shall permit Lender or Lender's representative, at Borrower's expense, to visit and inspect any of its properties, corporate books and financial records, and to discuss its accounts, affairs and finances with Borrower at the principal offices of Borrower or where Collateral is located, all at such times as Lender may reasonably request.  Borrower shall pay all reasonable out-of-pocket expenses of Lender or Lender's representative in conducting such investigation, including travel expenses, per diem charges of Lender's representative and any professional fees incurred by Lender in conducting such inspection.

4.9    Compliance with Law and Agreements.  Borrower will and will cause its Affiliates to maintain its business operations and property owned or used in connection therewith in compliance in all material respects with (a) all applicable federal, state and local laws, regulations and ordinances governing such business operations and the use and ownership of such property, and (b) all agreements, licenses, franchises, indentures, mortgages and deeds of trust to which Borrower or any Affiliate is a party or by which Borrower or any Affiliate or any of its properties is bound.

4.10    Notice of Litigation.  Borrower will promptly give notice, in writing, to Lender of (a) any actions, suits or proceedings, litigation or investigation instituted or threatened against Borrower, Guarantor, any Affiliate or any director, officer or key employee of Borrower or any Affiliate, by any person or entity whomsoever, that if brought or, if adversely determined, could materially adversely affect any of the business, assets or condition, financial or otherwise of Borrower, Guarantor or any Affiliate, and (b) any dispute between Borrower, Guarantor or any Affiliate, on the one hand and any governmental regulatory body on the other hand.

4.11    Taxes and Assessments.  Borrower will and will cause each Affiliate to (a) file all tax returns and appropriate schedules thereto that are required to be filed under applicable law, prior to the date of delinquency, (b) pay and discharge all taxes, assessments and governmental charges or levies imposed upon Borrower or any Affiliate, upon its income and profits or upon any properties belonging to it, prior to the date on which penalties attach thereto, and (iii) pay all taxes, assessments and governmental charges or levies that, if unpaid, might become a lien or charge upon any of its or such Affiliate's properties.

4.12    Notice of Default.  Borrower will give written notice to Lender of the occurrence of any Event of Default (as defined below) under this Agreement or any event of default under any other Loan Document, promptly upon the occurrence thereof.

4.13    Sale of Ownership Interests.  Other than in connection with the Loan Facility and the Reorganization, Borrower will not and will not allow any Affiliate to, without the prior written consent of Lender, issue, sell, transfer or otherwise dispose of any membership or other equity ownership interests of Borrower or such Affiliate.

4.14    Restricted Payments.  Without the prior written consent of Lender, Borrower will not and will cause each Affiliate to not declare, set aside, or pay or make any dividend or other distribution to its

members, other than reasonable compensation for services as an employee to Borrower or an Affiliate in accordance with past practices.

4.15    Change of Name or Location.  Borrower will not and will cause each Affiliate to not change its legal name or the location of its principal business office until it will have (a) given Lender at least thirty (30) days prior written notice of its intention to do so, clearly describing such new name and/or location and providing such additional information as Lender may reasonably request; and (b) taken all action requested by Lender to maintain the security interest of Lender in the Collateral fully perfected and in full force and effect.

4.16    Change of Business Activity or Purpose.  Borrower will not and will cause each Affiliate to not, without obtaining the prior written consent of Lender, change its business activity or purpose from that currently conducted.

4.17    Amendment of Organizational Documents.  Borrower will not and will cause each Affiliate to not, so long as the Secured Obligations remain outstanding, without the prior written consent of Lender, (a) amend or repeal any provision of or add any provision to, the Borrower's or such Affiliate's operating agreement or other organizational documents or (b) enter into any agreement, or amend any existing agreement, that would prohibit or restrict Borrower from performing its obligations under the Loan Documents.

## ARTICLE V
## DEFAULT

5.1    Events of Default.  The occurrence of any of the following will constitute an "**Event of Default**" hereunder:

(a)    Default in the payment of the principal of or interest on the indebtedness evidenced by the Promissory Note in accordance with the terms of the Promissory Note;

(b)    Any material misrepresentation by Borrower as to any matter hereunder or under any of the other Loan Documents, or delivery by Borrower of any schedule, statement, resolution, report, certificate, notice or writing to Lender that is untrue in any material respect on the date as of which the facts set forth therein are stated or certified;

(c)    Failure of Borrower to perform any of its obligations under this Agreement or any of the other Loan Documents, which failure is not cured not later than five (5) business days after such failure;

(d)    The entering into or consummating of any change in control by Borrower or any Affiliate without either the prior written consent of Lender or the simultaneous payment in full of all Secured Obligations, including the payment of any prepayment fees associated with a prepayment before the Maturity Date;

(e)    Borrower's or any Affiliate's (i) admission in writing of its inability to pay its debts generally as they become due; or (ii) assignment for the benefit of creditors or petition or application to any tribunal for the appointment of a custodian, receiver or trustee for it or a substantial part of its assets; or (iii) voluntary commencement of any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or the involuntary commencement of any such proceeding that is not dismissed within thirty (30) days; or (iv) suffering to exist any such petition or application or

any such proceeding against it in which an order for relief is entered or an adjudication or appointment is made; or (v) indication, by any act or omission, of its consent to, approval of or acquiescence in any such petition, application, proceeding or order for relief or the appointment of a custodian, receiver or trustee for it or a substantial part of its assets, or (vi) permitting any such custodianship, receivership or trusteeship to continue undischarged for a period of thirty (30) days or more or (vii) failure to discharge any material judgment against Borrower or any Affiliate for a period of thirty (30) days or more;

(f)     Borrower's or any Affiliate's liquidation, dissolution, or other termination;

(g)     A default or event of default under any of the other Loan Documents that, if subject to a cure right, is not cured within any applicable cure period;

(h)     Any material adverse change in the business, operations, assets, liabilities, prospects for repayment, properties, condition (financial or otherwise) or results of operations, of Borrower, any Affiliate or any Guarantor and any litigation or governmental proceeding or investigation brought or threatened against Borrower, any Affiliate or Guarantor, or any director, manager, shareholder, officer, key employee or partner of Borrower or any Affiliate or Guarantor which materially adversely affects the business, operations, assets, liabilities, prospects for repayment, properties, condition (financial or otherwise) or results of operations of Borrower, any Affiliate or any Guarantor; or

(i)     Borrower's default in the timely payment or performance of any obligation now or hereafter owed to Lender in connection with any indebtedness of Borrower now or hereafter owed to Lender other than the Loans that, if subject to a cure right, is not cured within any applicable cure period.

5.2     Acceleration of Maturity, Remedies.  Upon the occurrence of any Event of Default, the Secured Obligations will be immediately due and payable in full; and Lender at any time thereafter may at its option accelerate the maturity of the Secured Obligations.  Upon the occurrence of any such Event of Default, the Lender will have the following rights and remedies:

(a)     All of the rights and remedies of a secured party under the Uniform Commercial Code of the State of Connecticut, or under other applicable law, all of which rights and remedies will be cumulative, and none of which will be exclusive, to the extent permitted by law, in addition to any other rights and remedies contained in this Agreement, the Promissory Note or the other Loan Documents.

(b)     The right to: (i) enter upon the premises of Borrower, or any other place or places where the Collateral is located and kept, through self-help and without judicial process, without first obtaining a final judgment or giving Borrower notice and opportunity for a hearing on the validity of Lender' claims and without any obligation to pay rent to Borrower, and remove the Collateral therefrom to the premises of Lender or any agent of Lender, for such time as Lender may desire, in order to effectively collect or liquidate the Collateral, and/or (ii) require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender in its sole discretion.

(d)     The right to sell or otherwise dispose of all or any Collateral in its then existing condition at public or private sale or sales, with such notice as may be required by law, in lots or in bulk, for cash or on credit, all as Lender, in their sole discretion may deem advisable; such sales may be adjourned from time to time with or without notice.  The Lender will have the right to conduct such sales on the premises of Borrower or elsewhere and will have the right to use the premises of Borrower without charge for such sales for such time or times as Lender may see fit.  The Lender is hereby granted a license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral and the rights of Borrower under all licenses, and all franchise agreements will inure to Lender' benefit.  The Lender will

have the right to sell, lease or otherwise dispose of the Collateral, or any part thereof, for cash, credit or any combination thereof, and Lender may purchase all or any part of the Collateral at public or, if permitted by applicable law, private sale and, in lieu of actual payment of such purchase price, may set off the amount of such price against the Secured Obligations.

(e)  Any notice required to be given by Lender of a sale, lease, other disposition of the Collateral or any other intended action by Lender, given to Borrower in the manner set forth in Section 6.9 below ten (10) days prior to such proposed action, will constitute commercially reasonable and fair notice thereof to Borrower.

(f)  Upon an Event of Default, Borrower irrevocably designates, makes, constitutes, and appoints Lender (and all persons designated by Lender) as the true and lawful attorney of Borrower, and Lender may, without notice and at such time or times thereafter as Lender, in Lender's sole discretion, may determine, in the name of Borrower, or Lender's name: (i) demand payment of accounts; (ii) enforce payment of accounts by legal proceedings or otherwise; (iii) exercise all of Borrower's rights and remedies regarding the collection of accounts; (iv) settle, adjust, compromise, extend or renew accounts; (v) settle, adjust or compromise any legal proceedings brought to collect accounts; (vi) if permitted by applicable law, sell or assign accounts and other Collateral upon such terms, for such amounts and at such time or times as Lender deem advisable; (vii) discharge and release accounts and other Collateral; (viii) prepare, file and sign the name of Borrower on a proof of claim in bankruptcy or similar document against any account debtor and exercise Borrower's rights to vote with respect thereto in such bankruptcy case; (ix) prepare, file and sign the name of Borrower on any notice of lien, assignment or satisfaction of lien or similar document in connection with accounts and other Collateral; (x) do all acts and things necessary, in Lender' sole discretion, to fulfill the obligations of Borrower under this Agreement; (xi) endorse the name of Borrower upon any of the items of payment or proceeds thereof and deposit the same to the account of Lender on account of the Secured Obligations; (xii) endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to the accounts, inventory and other Collateral; (xiii) use the stationery and sign the name of Borrower to verifications of such accounts and notices thereof to account debtors; and (xiv) use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Collateral to which Borrower has access.

(g)  Upon an Event of Default, unless expressly prohibited by any licensor thereof, the Lender are hereby granted a license to use all computer software programs, data bases, processes, trademarks, tradenames and materials used by Borrower in connection with its business or in connection with the Collateral.

5.3  Remedies Cumulative, No Waiver.  No right, power or remedy conferred upon or reserved to Lender by this Agreement or any of the other Loan Documents is intended to be exclusive of any other right, power or remedy, but each and every such right, power and remedy will be cumulative and concurrent and will be in addition to any other right, power and remedy given hereunder, under any of the other Loan Documents or now or hereafter existing at law, in equity or by statute. No delay or omission by Lender to exercise any right, power or remedy accruing upon the occurrence of any Event of Default will exhaust or impair any such right, power or remedy or will be construed to be a waiver of any such Event of Default or an acquiescence therein, and every right, power and remedy given by this Agreement and the other Loan Documents to Lender may be exercised from time to time and as often as may be deemed expedient by Lender.

    5.4    Proceeds of Remedies.  Any or all proceeds resulting from the exercise of any or all of the foregoing remedies will be applied as set forth in the Loan Document(s) providing the remedy or remedies exercised; if none is specified, or if the remedy is provided by this Agreement, then as follows:

          (i)    First, to the costs and expenses, including reasonable attorneys' fees, incurred by Lender in connection with the exercise of its remedies;

          (ii)    Second, to the expenses of curing the default that has occurred, in the event that Lender, in its reasonable discretion, incur expenses to cure the default that has occurred;

          (iii)    Third, to the payment of the Secured Obligations, including but not limited to the payment of the principal of and interest on the indebtedness evidenced by the Promissory Note, in such order of priority as Lender will determine in its sole discretion; and

          (iv)    Fourth, the remainder, if any, to Borrower or to any other person lawfully thereunto entitled.

If any deficiencies remain after the payments as set forth above, Borrower shall remain liable to Lender for such deficiency.

## ARTICLE VI
## MISCELLANEOUS

    6.1    Performance by Lender.  If Borrower defaults in the payment, performance or observance of any covenant, term or condition of this Agreement, Lender may, following expiration of any applicable cure period, at its option, pay, perform or observe the same, and all payments made or costs or expenses incurred by Lender in connection therewith (including but not limited to reasonable attorneys' fees), with interest thereon at the highest default rate provided in the Promissory Note (but not exceeding the maximum contract rate from time to time allowed by applicable law), will be immediately repaid to Lender by Borrower and will constitute a part of the Secured Obligations and be secured hereby until fully repaid.  Lender, in their reasonable discretion, will determine the necessity for any such actions and of the amounts to be paid.

    6.2    Indemnification.  Borrower hereby agrees to defend, protect, indemnify and hold harmless Lender, all directors, officers, stockholders, partners, managers, employees, attorneys, agents and independent contractors of Lender, from and against all claims, actions, liabilities, damages and costs and expenses asserted against, imposed upon or incurred by Lender or any of such other persons as a result of, or arising from, or relating to Borrower's violation or breach of this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby.

    6.3 Waivers.

        (a)    Waiver of Trial by Jury.  To the extent not prohibited by applicable law, Borrower and Lender each hereby waive their respective rights to a jury trial of any claim or cause of action based upon or arising out of any of the Loan Documents or any of the transactions contemplated therein, including contract claims, tort claims, breach of duty claims and all other common law or statutory claims.  Each party recognizes and agrees that the foregoing waiver constitutes a material inducement for it to enter into this Agreement.  Each party represents and warrants that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.

(b)     Marshalling of Assets.  Borrower hereby waives, to the extent permitted by law, the benefit of all appraisal, valuation, stay, extension, reinstatement and redemption laws now in force and those hereafter in force and all rights of marshalling in the event of any sale hereunder of the Collateral by Lender or any part or any interest therein.

6.4     Successors and Assigns Included in Parties.  Whenever in this Agreement one of the parties hereto is named or referred to, the heirs, legal representatives, successors, successors-in-title and assigns of such parties will be included, and all covenants and agreements contained in this Agreement by or on behalf of Borrower or by or on behalf of Lender will bind and inure to the benefit of their heirs, legal representatives, successors, successors-in-title and assigns, whether so expressed or not.

6.5     Costs and Expenses.  Borrower agrees to pay all costs and expenses reasonably incurred by Lender, including but not limited to attorneys' fees up to $10,000, and filing fees, recording taxes and travel expenses at Closing.  Borrower further agrees to pay all premiums for insurance required to be maintained pursuant to the terms of this Agreement and all of the out-of-pocket costs and expenses incurred by Lender in connection with the collection of the Secured Obligations upon an Event of Default, including but not limited to reasonable attorneys' fees, promptly upon demand of Lender. Borrower agrees to pay all reasonable attorneys' fees incurred by Lender in connection with the amendment, modification, and/or waiver of any rights available to Lender pursuant to this Agreement from time to time.

6.6     Assignment.  The Promissory Note, this Agreement and the other Loan Documents may be endorsed, assigned and/or transferred in whole or in part by Lender, and any such holder and/or assignee of the same will succeed to and be possessed of the rights and powers of Lender to the extent transferred and assigned.  Borrower will not assign any of its rights or delegate any of its duties hereunder or under any of the other Loan Documents without the prior express written consent of Lender.

6.7     Severability.  If any provision(s) of this Agreement or the application thereof to any person or circumstance will be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances will not be affected thereby and will be enforced to the greatest extent permitted by law.

6.8     Interest and Loan Charges Not to Exceed Maximum Allowed by Law.  Notwithstanding any provisions of this Agreement, the Promissory Note, or the Loan Documents, under no circumstances (whether by advancement of loan proceeds, acceleration of the maturity of the indebtedness or otherwise) shall the interest and loan charges paid or contracted to be paid by Borrower pursuant to the Promissory Note exceed the maximum amounts collectible under applicable laws in effect from time to time.  If the interest or loan charges paid or contracted to be paid by Borrower pursuant to the Promissory Note exceed the maximum amounts collectible under applicable laws in effect from time to time, then such interest and/or loan charges will be reduced to the maximum amounts collectible under applicable laws in effect from time to time, and any amounts collected by Lender that exceed such maximum amounts will be applied to the reduction of the principal balance of the Note and/or refunded to Borrower.

6.9     Notices.  Any and all notices, elections or demands permitted or required to be made under this Agreement will be in writing, signed by the party giving such notice, election or demand and will be delivered personally, by facsimile (with written confirmation of transmission) or sent by certified mail or nationally recognized courier service (such as Federal Express), to the other party at the address set forth on the signature pages hereto, or at such other address as may be supplied in writing and of which receipt has been acknowledged in writing.  The date of personal delivery, or one business day after delivery to such courier service or two business days after mailing, as the case may be, will be the date of such notice, election or demand.

6.10    <u>Entire Agreement</u>.  This Agreement and the other Loan Documents represent the entire agreements between the parties concerning the subject matter hereof, and all oral discussions and prior agreements are hereby merged into this Agreement and such other agreements.

6.11    <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts (including facsimile counterparts), each of which will be considered an original, and all of which, when taken together, will constitute one and the same instrument.

6.12    <u>Choice of Law; Jurisdiction</u>.  This Agreement and the Loan Documents shall be deemed to have been made in the State of Connecticut and shall be governed by and construed in accordance with the laws of the State of Connecticut without giving effect to any choice or conflict of law provision or rule (whether in the State of Connecticut or any other jurisdiction) that would cause the application of the laws of any other jurisdiction.   Borrower and Lender agree that the Federal and State courts of Connecticut shall be the exclusive forum for the resolution of any disputes related to this Agreement or the performance by Borrower and Lender of their respective obligations hereto.  Borrower and Lender consent to such exclusive jurisdiction and agree to waive and not assert any objections to such jurisdiction, including those related to forum non conveniens.

*[Signature page follows.]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or have caused this Agreement to be executed by their duly authorized officers, as of the day and year first above written.

LENDER:                                    BORROWER:
COLGAN FINANCIAL GROUP, INC.               FIRST 100, LLC

By: _____                 By: _____
    Name:   Robert Colgan                       Name:  MATTHEW S. FARKAS
    Title:   President                           Title:  VP of FINANCE
    Address: 265 Post Road West             Address: 11920 Southern Highlands Parkway –
             Westport, CT  06880                     Suite 210
                                                     Las Vegas, NV  89141

**EXHIBIT B**

COPY

## SHORT TERM ORIGINAL ISSUE DISCOUNT PROMISSORY NOTE

Face Amount: $1,650,000                                        December 20, 2013
Principal Funding Amount: $750,000

      FOR VALUE RECEIVED, **First 100, LLC,** a Nevada limited liability company with its principal offices located at 11920 Southern Highlands Parkway, Suite 200, Las Vegas, Nevada 89141 (the "Borrower"), promises to pay to the order of **Colgan Financial Group, Inc.,** a Connecticut corporation with its principal place of business at 265 Post Road West, Westport, CT 06880, or its registered assigns (the "Lender"), upon the terms set forth below, the Face Amount of One Million Six Hundred Fifty Thousand Dollars ($1,650,000) (this "Note").

      1.    Loan and Security Agreement.    This Note shall be subject to the terms and conditions of the Loan and Security Agreement, dated the date hereof, between Borrower and Lender (the "Loan Agreement"). Capitalized terms used herein which are not otherwise defined in this Note shall have the meanings set forth in the Loan Agreement. This Note is entitled to the benefit and the security of the Loan Agreement, including, without limitation, a lien in favor of Lender in all Collateral as set forth therein.

      2.    Payment Terms.

      The Principal Funding Amount of $750,000 shall be repaid in full on the earlier of February 20, 2014 or the date of the closing of the Loan Facility.

      A return on investment payment (the **"ROI Payment"**) in the amount of $900,000 shall be paid in six (6) monthly installments of $150,000, $150,000 on each of January 20, 2014, February 20, 2014, March 20, 2014, April 20, 2014, May 20, 2014, with a final payment due on June 20, 2014 ("**Maturity Date**"). Each ROI Payment is equivalent to 20% of the Principal Funding Amount.

      Borrower at its option may prepay this Note prior to the Maturity Date in whole, but not in part, and shall in all events satisfy in full the outstanding obligations under this Note upon closing of the Loan Facility. In connection with any payment of this Note prior to the Maturity Date (including for clarity any prepayment or payment in connection with the closing of the Loan Facility), Borrower shall pay to Lender any outstanding balance of the Face Amount.

      All payments due hereunder shall be payable in money of the United States of America that at the time is legal tender for the payment of public and private debts. The Borrower shall make all payments on this Note in accordance with the terms hereof by wire transfer to the account specified on *Schedule A* hereof, or by delivering a check addressed to Lender by nationally recognized overnight courier at Lender's address set forth on *Schedule A* hereto.

      3.    Events of Default.    An Event of Default under the Loan Agreement or under any other Loan Document shall constitute an Event of Default under this Note. Upon the occurrence of an Event of Default, the entire Face Amount of this Note and all other Secured Obligations, shall, at Lender's option, become immediately due and payable, except that if there occurs an Event of Default described in Section 5.1(e) or 5.1(f) of the Loan Agreement, the entire unpaid balance of the Face Amount of this Note, and all other Secured Obligations, shall become automatically and immediately due and payable without notice, which Borrower hereby waives.

      Upon the occurrence of an Event of Default, interest shall accrue on the unpaid balance of this Note, including the entire Face Amount if such amount is accelerated by Lender as set forth above, at the rate of five percent (5%) per month; provided that this paragraph shall not be deemed to constitute a waiver of any Event of Default or an agreement by Lender to permit any late payments.

      Upon the occurrence of an Event of Default, Lender may pursue all rights and remedies available under applicable law and as set forth in the Loan Agreement and any other Loan Document.

COPY

4.    Replacement of Note.    Upon receipt by the Borrower of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Note and, in case of loss, theft or destruction, of indemnity reasonably satisfactory to it, or, in the case of mutilation, upon surrender and cancellation of this Note, the Borrower will make and deliver a new Note of like tenor in lieu of this Note.

5.    Applicable Law.    This Note shall be deemed to have been made in the State of Connecticut and shall be governed by and construed in accordance with the laws of the State of Connecticut without giving effect to any choice or conflict of law provision or rule (whether in the State of Connecticut or any other jurisdiction) that would cause the application of the laws of any other jurisdiction. Borrower and Lender agree that the Federal and State courts of Connecticut shall be the exclusive forum for the resolution of any disputes related to this Note or the performance by Borrower and Lender of their respective obligations hereto. Borrower and Lender consent to such exclusive jurisdiction and agree to waive and not assert any objections to such jurisdiction, including those related to *forum non conveniens*.

6.    Miscellaneous.

Borrower, for itself and its successors and assigns, hereby waives presentment for payment, demand, notice of nonpayment, notice of dishonor, protest of any dishonor, notice of protest and protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note, and agrees that its liability shall be unconditional and without regard to the liability of any other party and shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by the Lender.

Borrower agrees to pay all costs and expenses, including reasonable attorneys' fees, and all other out-of-pocket expenses of Lender paid to others, which may be incurred by Lender in connection with the collection of any indebtedness evidenced hereby, whether or not suit is filed hereon (including, without limitation, all such fees and expenses as may be incurred by Lender in or in connection with any bankruptcy or insolvency proceeding filed by or against the Borrower).

This Note shall be binding on the Borrower and its permitted successors and assigns, and shall inure to the benefit of the Lender and its successors and assigns.

This Note may be amended, modified or cancelled only by written agreement of the Borrower and Lender.

In case any provision of this Note shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Each of the rights, remedies or options provided herein or available at law or in equity which may be exercised by Lender may be exercised separately or concurrently with any one or more other options, rights, or remedies. Such rights, powers and remedies shall not be exhausted by any exercise thereof but may be exercised as often as occasion therefor shall occur. Lender shall not by any act of omission or commission be deemed to waive any of its rights, powers or remedies under this Note unless such waiver is in writing and signed by Lender and then only to the extent specifically set forth therein. Failure to exercise any option, right, or remedy shall not constitute a waiver of the right of the Lender to exercise such option, right or remedy in the event of or with respect to any prior, subsequent or concurrent transaction or occurrence of the same or a different kind or character. Lender's acceptance of any partial payment after the time when such payment becomes due and payable hereunder shall not be held to establish a custom, or to waive any of Lender's rights to enforce prompt payment of this Note or any of Lender's other rights hereunder.

Unless applicable law requires a different method of giving notice, all notices required or permitted hereunder shall be delivered in accordance with Section 6.9 of the Loan Agreement.

Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, and shall not invalidate the remainder of such provision or the remaining provisions of this Note. Without limiting the generality of the



COPY

foregoing, and notwithstanding any provisions of this Note or the Loan Documents, under no circumstances (whether by advancement of loan proceeds, acceleration of the maturity of the indebtedness or otherwise) shall the interest and loan charges paid or contracted to be paid by Borrower pursuant to this Note exceed the maximum amounts collectible under applicable laws in effect from time to time. If the interest or loan charges paid or contracted to be paid by Borrower pursuant to this Note exceed the maximum amounts collectible under applicable laws in effect from time to time, then such interest and/or loan charges will be reduced to the maximum amounts collectible under applicable laws in effect from time to time, and any amounts collected by Lender that exceed such maximum amounts will be applied to the reduction of the principal balance of this Note and/or refunded to Borrower.

Any person executing and delivering this Note on behalf of any entity hereby represents and warrants that such execution and delivery is duly authorized by all appropriate entity action and that, upon such execution and delivery, this Note shall be binding upon and enforceable against such entity in accordance with its terms.

Time is of the essence with respect to the performance of all obligations of the Borrower hereunder.

Borrower certifies that the proceeds of the Loan will be used for the purposes set forth in the Loan Agreement.

IN WITNESS WHEREOF, the Borrower has duly executed and delivered this Note as of the date first written above.

**FIRST 100, LLC**

By: [signature]
Name: MATTHEW FARKAS
Title: VP FINANCE

## SCHEDULE A

### Lender Information

Colgan Financial Group, Inc.
265 Post Road West
Westport, CT 06880

Wire Transfer Instructions:

Bank:                TD Bank
Address:             185 Main Street
                     Westport, CT 06880
Account Name: Colgan Financial Group, Inc.
Routing Number:      031101266
Account Number:      █████████
Company Address:     265 Main Street
                     Westport, CT 06880

If you have any questions, please call 203 454-1484.

**EXHIBIT C**

# GUARANTY

To induce Colgan Financial Group, Inc., a Connecticut corporation, with an address of 265 Post Road West, Westport, CT 06880 ("**Lender**") to enter into that certain Loan and Security Agreement dated December 20, 2013 (as amended, restated or superseded, the "**Loan Agreement**") with First 100, LLC, a Nevada limited liability company, with an address of 11920 Southern Highlands Pkwy, Suite 200, Las Vegas, NV 89141 ("**Borrower**") and that certain Secured Promissory Note issued by Borrower to Lender under the Loan Agreement (as amended, restated or superseded, the "**Promissory Note**", and to provide the Loan and advance the proceeds accordance with the Loan Agreement, the undersigned ("**Guarantor**") hereby unconditionally and irrevocably guarantees the full and final payment of the funded portion of the Promissory Note in the Amount of $750,000 due and owing to Lender under the Loan Agreement and Promissory Note, in addition to all costs and expenses incurred by Lender in connection with the enforcement of this Guaranty, including but not limited to reasonable attorneys' fees (collectively, the "**Obligations**").

Guarantor is a shareholder and/or director of Borrower and Guarantor will benefit from and desires to enter into, this Guaranty. Guarantor agrees that the liability under this Guaranty shall be unconditional, irrevocable and primary, and that in any right of action which shall accrue to Lender in connection with the Obligations, Lender may, at its option, proceed against the undersigned without having commenced any action or having obtained any judgment against the Borrower or any other party. No delay or omission on Lender's part in exercising any right hereunder shall operate as a waiver of such right or any other right; a waiver on one occasion shall not be a bar to or waiver of any right on any other occasion. Guarantor hereby waives all suretyship defenses, and further waives demand, presentment, protest, increase in risk and notice of Lender's acceptance of this agreement or other action taken in reliance hereon and all other demands and notices of any description in connection with this Guaranty, the Loan Agreement, the Promissory Note or otherwise. This is a guaranty of payment and not of collection, and Guarantor's liability hereunder shall not be affected by any bankruptcy or insolvency or the existence of any other circumstance or event that would discharge or excuse a guarantor or surety from liability.

Guarantor represents and warrants that Guarantor has sufficient liquid financial resources to satisfy in full the Obligations and that the information previously provided to Lender in Guarantor's personal financial statement setting forth Guarantor'a liquid net worth is true, complete and correct in all material respects. Guarantor shall immediately notify Lender of any material adverse change to Guarantor's liquid net worth as reflected in such financial statement.

Guarantor further covenants and agrees that this Guaranty shall remain and continue in full force and effect as to any renewal, modification, extension or restatement of the Obligations, whether or not Guarantor has received any notice of or consented to the same. Guarantor further agrees that this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time payment of any part thereof received by Guarantor on account of the Obligations is rescinded

or must otherwise be returned in the bankruptcy or reorganization of Borrower or otherwise. Guarantor further agrees that the liability under this Guaranty shall be unconditional, irrevocable and primary.

GUARANTOR ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS GUARANTY IS A PART IS A COMMERCIAL TRANSACTION, AND HEREBY WAIVES TRIAL BY JURY IN ANY PROCEEDING ARISING UNDER OR RELATING TO THIS GUARANTY AND ANY COUNTERCLAIM THEREON.

This Guaranty shall be binding upon the undersigned Guarantor and his heirs, executors and administrators, and shall inure to the benefit of and be enforceable by Lender, and each successive holder of any of the rights to the Obligations. This Guaranty and the Loan Agreement and Promissory Note shall be deemed to have been made in the State of Connecticut and this Guaranty shall be governed by and construed in accordance with the laws of the State of Connecticut, without regard to its conflicts of law principles. Any disputes hereunder shall be exclusively adjudicated in the state or federal courts of the State of Connecticut and the undersigned hereby agrees to submit to the exclusive jurisdiction of such courts with respect to any such disputes.

IN WITNESS WHEREOF, the undersigned has executed this Guaranty as of December 20, 2013.

Guarantor:

Mr. Jay Bloom

On _____, 2014, before me personally came Mr. Jay Bloom, known to be the individual described in and who executed the foregoing Guaranty and duly acknowledged to me that he executed the same.

Subscribed and sworn to before me this _____ day of _____, 2014

_____
Notary Public

**EXHIBIT D**

# GUARANTY

To induce Colgan Financial Group, Inc., a Connecticut corporation, with an address of 265 Post Road West, Westport, CT 06880 ("**Lender**") to enter into that certain Loan and Security Agreement dated December 20, 2013 (as amended, restated or superseded, the "**Loan Agreement**") with First 100, LLC, a Nevada limited liability company, with an address of 11920 Southern Highlands Pkwy, Suite 200, Las Vegas, NV 89141 ("**Borrower**") and that certain Secured Promissory Note issued by Borrower to Lender under the Loan Agreement (as amended, restated or superseded, the "**Promissory Note**", and to provide the Loan and advance the proceeds accordance with the Loan Agreement, the undersigned ("**Guarantor**") hereby unconditionally and irrevocably guarantees the full and final payment of the funded portion of the Promissory Note in the Amount of $750,000 due and owing to Lender under the Loan Agreement and Promissory Note, in addition to all costs and expenses incurred by Lender in connection with the enforcement of this Guaranty, including but not limited to reasonable attorneys' fees (collectively, the "**Obligations**").

Guarantor is a shareholder and/or director of Borrower and Guarantor will benefit from and desires to enter into, this Guaranty. Guarantor agrees that the liability under this Guaranty shall be unconditional, irrevocable and primary, and that in any right of action which shall accrue to Lender in connection with the Obligations, Lender may, at its option, proceed against the undersigned without having commenced any action or having obtained any judgment against the Borrower or any other party. No delay or omission on Lender's part in exercising any right hereunder shall operate as a waiver of such right or any other right; a waiver on one occasion shall not be a bar to or waiver of any right on any other occasion. Guarantor hereby waives all suretyship defenses, and further waives demand, presentment, protest, increase in risk and notice of Lender's acceptance of this agreement or other action taken in reliance hereon and all other demands and notices of any description in connection with this Guaranty, the Loan Agreement, the Promissory Note or otherwise. This is a guaranty of payment and not of collection, and Guarantor's liability hereunder shall not be affected by any bankruptcy or insolvency or the existence of any other circumstance or event that would discharge or excuse a guarantor or surety from liability.

Guarantor represents and warrants that Guarantor has sufficient liquid financial resources to satisfy in full the Obligations and that the information previously provided to Lender in Guarantor's personal financial statement setting forth Guarantor'a liquid net worth is true, complete and correct in all material respects. Guarantor shall immediately notify Lender of any material adverse change to Guarantor's liquid net worth as reflected in such financial statement.

Guarantor further covenants and agrees that this Guaranty shall remain and continue in full force and effect as to any renewal, modification, extension or restatement of the Obligations, whether or not Guarantor has received any notice of or consented to the same. Guarantor further agrees that this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time payment of any part thereof received by Guarantor on account of the Obligations is rescinded

or must otherwise be returned in the bankruptcy or reorganization of Borrower or otherwise. Guarantor further agrees that the liability under this Guaranty shall be unconditional, irrevocable and primary.

GUARANTOR ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS GUARANTY IS A PART IS A COMMERCIAL TRANSACTION, AND HEREBY WAIVES TRIAL BY JURY IN ANY PROCEEDING ARISING UNDER OR RELATING TO THIS GUARANTY AND ANY COUNTERCLAIM THEREON.

This Guaranty shall be binding upon the undersigned Guarantor and his heirs, executors and administrators, and shall inure to the benefit of and be enforceable by Lender, and each successive holder of any of the rights to the Obligations. This Guaranty and the Loan Agreement and Promissory Note shall be deemed to have been made in the State of Connecticut and this Guaranty shall be governed by and construed in accordance with the laws of the State of Connecticut, without regard to its conflicts of law principles. Any disputes hereunder shall be exclusively adjudicated in the state or federal courts of the State of Connecticut and the undersigned hereby agrees to submit to the exclusive jurisdiction of such courts with respect to any such disputes.

IN WITNESS WHEREOF, the undersigned has executed this Guaranty as of December 20, 2013.

Guarantor:

Mr. Matthew Farkas

On _____, 2014, before me personally came Mr. Matthew Farkas, known to be the individual described in and who executed the foregoing Guaranty and duly acknowledged to me that he executed the same.

Subscribed and sworn to before me this _____ day of _____, 2014

_____
        Notary Public

**EXHIBIT E**

**First 100, LLC**
11920 Southern Highlands Parkway
Suite 200
Las Vegas, NV 89141

December 20, 2013

Colgan Financial Group, Inc.
Robert Colgan, Managing Partner
265 Post Road West
Westport, CT 06880

      Re:    Equity Profit Sharing Agreement

Gentlemen:

      We are writing confirm our agreement with respect to the equity profit sharing tail to which we have agreed in connection with that certain Loan and Security Agreement ("Loan Agreement") by and among First 100, LLC ("Borrower") and Colgan Financial Group, Inc. ("Lender"). In consideration of the mutual covenants and agreements hereinafter set forth and in the Loan Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

      Borrower (including its subsidiaries and affiliates, and their respective successors) shall pay to Lender an amount equal to one percent (1%) of the Net Profits (as defined below) generated from the assets (the "Poinciana Portfolio") acquired from the Association of Poinciana Villages, Inc. in connection with the transactions contemplated by the Loan Agreement. Such payments shall be made in cash, by wire transfer of immediately available funds, within five (5) business days following the completion of each calendar quarter. The first such payment shall be made in connection with the calendar quarter ending on March 31, 2014 and shall include the period from the date hereof through March 31, 2014. Subsequent payments shall be made each calendar quarter thereafter for so long as Borrower (including its subsidiaries and affiliates, or their respective successors) is managing all or any part of the Poinciana Portfolio. Lender shall provide a report setting forth such Net Revenue calculation along with each quarterly payment. Lender, upon reasonable advance notice may audit the books and records of Borrower with respect to the payments due under this agreement. If the amount owed to Lender differs by more than five percent (5%) of the amounts paid to Lender, then Borrower shall reimburse Lender for its costs and expenses associated with such audit.

      For the purposes of this Agreement, "Net Profits" shall be defined as gross revenue minus all direct expenses associated with the Poinciana Portfolio, determined in accordance with Borrower's past practices. For clarity, there shall be no allocation of corporate or other overhead in connection with the determination of Net Revenue.

{Client Files/CMG/LTR/00259239.DOCX}

This agreement shall be considered a Loan Document as defined in the Loan Agreement and breach or default under this agreement shall be deemed an Event of Default under the Loan Agreement.

This agreement represents the entire agreements between the parties concerning the subject matter hereof, and all oral discussions and prior agreements are hereby merged into this agreement.

This agreement may be executed in any number of counterparts (including facsimile counterparts), each of which will be considered an original, and all of which, when taken together, will constitute one and the same instrument.

This agreement shall be deemed to have been made in the State of Connecticut and shall be governed by and construed in accordance with the laws of the State of Connecticut without giving effect to any choice or conflict of law provision or rule (whether in the State of Connecticut or any other jurisdiction) that would cause the application of the laws of any other jurisdiction. Borrower and Lender agree that the Federal and State courts of Connecticut shall be the exclusive forum for the resolution of any disputes related to this agreement or the performance by Borrower and Lender of their respective obligations hereto. Borrower and Lender consent to such exclusive jurisdiction and agree to waive and not assert any objections to such jurisdiction, including those related to *forum non conveniens*.

[Signature page follows.]

If the foregoing accurately reflects our agreement, please so indicate in the space designated below, at which time it will become our binding agreement.

Sincerely,

FIRST 100, LLC

By: _____

Its: VP FINANCE

Accepted and Agreed:
Colgan Financial Group, Inc.

_____
Robert Colgan
President

3

{Client Files/CMG/LTR/00259239.DOCX}

**EXHIBIT F**

## LOAN AND SECURITY AGREEMENT, SHORT TERM ORIGINAL ISSUE DISCOUNT PROMISSORY NOTE AND EQUITY PROFIT SHARING AGREEMENT AMENDMENT #1 ("AMENDMENT")

Amendment No. 1 ("Amendment"), dated as of February 14, 2014, to Loan and Security Agreement dated December 20, 2013, by and between Colgan Financial Group Inc., a Connecticut corporation ("Lender") and First 100, LLC, a Nevada limited liability company ("Borrower").

WHEREAS, Borrower and Lender entered into a Loan and Security Agreement, dated December 20, 2013 ("Loan Agreement") and in connection therewith, also entered into a Short Term Original Issue Discount Promissory Note (the "Note"), and Equity Profit Sharing Agreement (the "Profit Sharing Agreement"), each dated December 20, 2013, among other documents (collectively, the Loan Agreement, the Note, the Profit Sharing Agreement, and such other documents, the "Agreements");

WHEREAS, Lender and Borrower agree that this Amendment is executed by and between Lender and Borrower and amends each of the Agreements to the extent applicable;

WHEREAS all capital terms included in the Amendment shall have the same meanings as in the Agreements.

NOW, THEREFORE, the Agreements are amended as follows:

1.      Extension of Payment Terms.  Subject to Section 2 below, the payment terms set forth in Section 1.1 of the Loan Agreement and Section 2 of the Note are amended ("Extensions") as follows:

- ROI Payment of $150,000 due January 20, 2014 is now due on or before March 20, 2014.
- The Principal Funding Amount of $750,000 due on February 20, 2014 is now due on or before March 20, 2014.
- All other payment terms under the Agreements, including, without limitation, the ROI Payment of $150,000 due on February 20, 2014, remain in effect as stated in the Loan Agreement, the Note and any other Agreement.

2.      Profit Sharing Agreement.  In consideration for the Extensions, the second paragraph of the Profit Sharing Agreement is amended such that the Borrower shall pay the Lender an amount equal to four percent (4%) (the "Carry Percentage") of the Net Profits generated from the Poinciana Portfolio.  Additionally, Borrower shall provide to Lender a formula, which is acceptable to Lender, for calculating the returns to Lender such that the pro forma value of each one percent (1%) of the Poinciana Portfolio is worth approximately $1,230,000 over the life of the Poinciana Portfolio.  Should the Extensions not be timely paid as set forth in Section 1 above, the payment due dates of the Extensions will automatically extend to April 20, 2014 and, if that occurs, the Carry Percentage shall increase by one percent (1%) to a total of five percent (5%) of the Net Profits of the Poinciana Portfolio.

{Client Files/DRC/AMD/00261822.DOCX}

3.     Confirmations.  The Borrower hereby confirms to the Lender that it is unconditionally indebted to the Lender for all amounts owed under the Loan Agreement, the Note, the Profit Sharing Agreement and all other Agreements, and that it has no claims, causes of action or counterclaims, whatsoever, in law or equity, in connection with such Agreements.  The Borrower hereby further confirms the grant in favor of the Lender of a continuing security interest in, inter alia, all of Collateral, pursuant to the Loan Agreement.

4.     Effect of Amendment.  The terms and conditions of the Loan Agreement, the Note, the Profit Sharing Agreement and each other Agreement shall remain the same and in full force and effect, except as specifically modified or replaced herein. The terms of this Amendment shall be binding upon and shall inure to the benefit of the successors and assigns of the parties hereto.  The Loan Agreement, the Note, the Profit Sharing Agreement and each other Agreement, as amended by this Amendment, together with all exhibits and schedules, supersedes all previous understandings and agreements between the parties, whether oral or written, with respect to the subject matter hereof.

5.     Counterparts.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument.  Signatures may be affixed manually or digitally and delivery of an executed counterpart of the signature pages to this Agreement by facsimile or by electronic means shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of this Agreement or facsimile or electronic means to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability or binding effect of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this agreement intending to be legally bound as of February 14, 2014.

**First 100, LLC**

By: _____

Name: MATTHEW FALKAS

Title: VP FINANCE

Executed this _14th_ day of February, 2014

**COLGAN FINACIAL GROUP INC.**

By: _____

Name: ROBERT T COGGINS

Title: PRESIDENT

Executed this _14th_ day of February, 2014

{Client Files/DRC/AMD/00261822.DOCX}