**EXHIBIT G**

**First 100, LLC**
11920 Southern Highlands Parkway
Suite 200
Las Vegas, NV 89141

March 3, 2014

Colgan Financial Group, Inc.
Robert Colgan, Managing Partner
265 Post Road West
Westport, CT 06880

Re:   Amendment No. 2 to Equity Profit Sharing Agreement

Gentlemen:

Colgan Financial Group Inc., a Connecticut corporation ("Lender"), and First 100, LLC, a Nevada limited liability company ("Borrower"), are parties to that certain Equity Profit Sharing Agreement (the "Profit Sharing Agreement") dated December 20, 2013, as amended by that certain Amendment No. 1 ("Amendment No. 1") dated February 14, 2014 to the Profit Sharing Agreement and the Agreements (as defined in Amendment No. 1). Amendment No. 1, among other things, contemplates that Lender and Borrower shall enter into this Amendment No. 2 to Profit Sharing Agreement ("Amendment No. 2") to document the formula and method for calculating the returns to Lender associated with its Carry Percentage (as defined in Amendment No. 1) which Borrower presented to Lender and upon which Lender relied in entering into Amendment No. 1. Now, therefore, for good and valuable consideration, including the covenants and conditions set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

The Carry Percentage shall entitle Lender to payments equal to the applicable Carry Percentage (4% currently and 5% upon the happening of certain conditions set forth in the Amendment) of the "Total Portfolio Income" determined as set forth in Row 32 of the Monthly Cash Flow spreadsheet (the "Cash Flow Spreadsheet") attached hereto as Exhibit 1. Borrower shall make such payments on a monthly basis, within ten (10) days following the completion of each calendar month, determined in accordance with the method set forth in the Cash Flow Spreadsheet. The parties acknowledge that the actual amount of the Total Portfolio Income may differ from the projected amounts set forth in such spreadsheet and the determination of the amount of each payment will be based on the Carry Percentage multiplied by actual Total Portfolio Income for each month.

The Carry Percentage is not subject to dilution and shall always be calculated as a percentage of Total Portfolio Income determined as set forth in the Cash Flow Spreadsheet. For example, should Borrower sell a 50% interest in the Poincianna Portfolio, Lender shall still be paid the applicable Carry Percentage of the Total Portfolio Income, notwithstanding the sale of such interest. In order that the payments to Lender are not diluted, payments may be made to

{Client Files/CMG/LTR/00262766.DOCX ver 2}

Lender from (a) the Total Portfolio Income prior to allocation of the Total Portfolio Income to Borrower and the purchaser of such interest or (b) Borrower's share of the Total Portfolio Income after the sale, which in this example would be accomplished by adjusting the Lender's percentage to 8% (or 10%, if applicable) of Borrower's share of such Total Portfolio Income. If Borrower sells the Poincianna Portfolio, Lender shall be paid at the closing of any such sale (regardless of the form of transaction) an amount equal to the then applicable Carry Percentage multiplied by the gross sale price of the Poincianna Portfolio. The payment terms and conditions of the Amendment No. 2 replace and supersede the payment terms and conditions based on Net Profits as set forth the Profit Sharing Agreement and Amendment No. 1.

The terms and conditions of the Profit Sharing Agreement as amended by Amendment No. 1 shall remain the same and in full force and effect, except as specifically modified or replaced herein. The terms the Profit Sharing Agreement, as amended, shall be binding upon and shall inure to the benefit of the successors and assigns of the parties hereto. The Profit Sharing Agreement, as amended, supersedes all previous understandings and agreements between the parties, whether oral or written, with respect to the subject matter hereof.

This Amendment No. 2 may be executed in any number of counterparts (including facsimile counterparts), each of which will be considered an original, and all of which, when taken together, will constitute one and the same instrument.

*[Signature page follows.]*

If the foregoing accurately reflects our agreement, please so indicate in the space designated below, at which time it will become our binding agreement.

Sincerely,

FIRST 100, LLC

By: _____
Its: Joel Just,
     President

Accepted and Agreed:
Colgan Financial Group, Inc.

_____
Robert Colgan
President

By: _____
Its: Erika Twesme

**Exhibit 1**
**Cash Flow Spreadsheet**

(see attached)

{Client Files/CMG/LTR/00262766.DOCX ver 2}

**PORTFOLIO ASSUMPTIONS**

PORTFOLIO COST AND EXPENSE ASSUMPTIONS

General, Acquisition, & Cash Flow
| | |
|---|---|
| Average Value of Home | $100,088 |
| Average Rent per month | $1,000 |
| Average Face Value of Lien (Receivables) | $1,559 |
| Average Purchase Price (Receivables) | $735 |
| Average Purchase Price (Deeds) | $0 |

Foreclosure Processing
| | |
|---|---|
| Average Trustee Processing Expense Per Property | $1,000 |

Post-Foreclosure - One Time Costs
| | |
|---|---|
| Transfer Tax | 0.475% |
| PM Placement Fee | $500 |
| Re-key and Secure | $500 |
| Rehab | $2,000 |
| Average eviction expense? (formal) | $600 |
| Average Tax Lien | $1,500 |

Ongoing Expenses During Cash Flow
| | |
|---|---|
| PM Fees & Maintenance | 4% |
| Sub HOA Dues | $0.00 |
| Master HOA Dues | $120.00 |

Quiet Title & Disposition
| | |
|---|---|
| Quiet Titles Challenged of Owned Assets | 10.00% |
| Average Quiet Title Expense | $1,500 |
| Disposition Expense | 5.00% |

PORTFOLIO REVENUE & CASH FLOW ASSUMPTIONS
| | |
|---|---|
| BK 11, 12, or 13 (We never end up in these) | 3.00% |
| Receivables that Payoff in Full | 12.00% |
| Payment Plan Down Payment | 0% |
| Payment Plan (Per Month) (50% Down/50% Over 12 mo.) | 2.00% |
| Receivables that Payoff w/Payment Plan | 0.0% |
| Immediately Lease | 60.5% |
| Delayed by Eviction | 19.5% |
| Occupancy Rates | 90% |
| Encumbered Home Sales (% of Owned Assets) | 0.0% |
| Successful Quiet Title of Owned Assets | 90% |

**CASH FLOW ANALYSIS**

TRANCHE A (POINCIANA)

| | TOTAL UNITS SOLD: | 0 | 0 | 0 | 0 | 0 | 0 | | |
|---|---|---|---|---|---|---|---|---|---|
| | TOTAL UNITS FORECLOSED: | 0 | 0 | 0 | 0 | 0 | 0 | 45 | 45 |

TOTALS/UNITS IN POSSESSION

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL DEAL PURCHASE PRICE | $ - | | | | | | | | |
| PLATINUM PURCHASE FUNDING | $ - | | | | | | | | |

# UNITS IN
Receivables --> 3,417
Deeds --> 0

NOTES

85   3% # Units Never CF      In BK ch's 11, 12, or 13

PORTFOLIO INCOME SOURCES

| | | | In F/C | 3,417 | | | | 2,800 | | | | 2,618 | | | | | 2,296 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Ownership | 1025 | 30% | Payoffs | | | | | | | | | | | | | | | |
| | | | Receivables Payoff in Full | $ - | $ | - | $ | - | $ | 176,034 | $ | 176,034 | $ | - | $ | 418,315 | $ | 418,315 | $ | 2,296 |
| | 0 | 0% | Receivables Payoff w/Payment Plan | $ - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | |
| Post-Ownership | | | Rents | | | | | | | | | | | | | | | |
| | 1396 | 61% | Delivered Vacant | | $ | - | $ | - | $ | - | $ | - | $ | - | $ | 465,333 | $ | 921,360 |
| | 450 | 20% | Immediately Lease | | $ | - | $ | - | $ | - | $ | - | $ | 450,000 | $ | 450,000 | $ | 450,000 |
| | 450 | 20% | Delayed by Eviction | | | | | | | | | | | | | | $ | 450,000 |
| Disposition | | | Sale Proceeds | | | | | | | | | | | | | | | |
| | 0 | 0% | Sales from Encumbered Homes | | | | | | | | | | | | | | | |
| | 804 | 35% | Sales from Q/T Homes | | | | | | | | | $ | - | $ | - | | | |
| | 0 | | Deduct for Replacement Properties | | | | | | | | | | | | | | | |
| | 1492 | 65% | Rent Revenue Lost to Foreclosure (Cumulative) | $ - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | (45,000) | $ | (45,000) |
| | | | Rent Revenue Lost from Sold Properties (Cumulat | $ - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | | |

Row 32
Total
Portfolio
Income

| TOTAL PORTFOLIO INCOME | $ - | $ | - | $ | - | $ | 176,034 | $ | 176,034 | $ | - | $ | 418,315 | $ | 868,315 | $ | 870,333 | $ | 1,776,360 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

PORTFOLIO EXPENSES

One-time Direct Costs
| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First 100 Purchase Contribution/Interest Payment | $ - | | | | | | | | | | | | | | | | |
| Trustee Processing | $ - | $ | - | $ | - | $ | 176,034 | $ | 176,034 | $ | 1,395,617 | $ | 418,315 | $ | 418,315 | $ | 1,688,970 | $ | - |
| Eviction Expense   Over 60 Days | | | | | | | | | | | | | | | | $ | 135,000 | $ | 135,000 |
| Rehab/Remediation Exp. | | | | | | | | | | | | | | | | $ | 1,846,000 | $ | 1,846,000 |
| PM Lease Up Fee & Reserve Account | | | | | | | | | | | | | | | | $ | 230,340 | $ | 304,590 |
| Re-key Expense | | | | | | | | | | | | | | | | $ | 60,918 | $ | 60,918 |
| Transfer Tax | | | | | | | | | | | | | | $ | 213,750 | $ | 331,550 | $ | 523,525 |
| Tax Lien Cleanup | | | | | | | | | | | | | | | | | | $ | 172,200 |
| Quiet Title Expense(In All Units Spread Over 5 months | | | | | | | | | | $ | 40,000 | $ | 40,000 | $ | 40,000 | $ | 40,000 | $ | 40,000 |
| Total One-time Direct Cost | $ - | $ | - | $ | - | $ | (176,034) | $ | (176,034) | $ | (1,435,617) | $ | (458,315) | $ | (672,065) | $ | (4,332,778) | $ | (3,082,633) |

Ongoing Direct Costs
| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HOA Dues | | | | | | $ | - | $ | - | $ | - | $ | - | $ | 9,450 | $ | 24,108 | $ | 47,271 |
| Management Fees & Maint. | | | $ | - | $ | - | $ | - | $ | - | $ | - | $ | 18,000 | $ | 34,813 | $ | 71,054 |
| Total Ongoing Direct Costs | $ - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | (27,450) | $ | (58,921) | $ | (118,325) |

| TOTAL PORTFOLIO EXPENSES | $ - | $ | - | $ | - | $ | (176,034) | $ | (176,034) | $ | (1,435,617) | $ | (458,315) | $ | (699,515) | $ | (4,391,700) | $ | (3,200,958) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| PORTFOLIO NET MONTHLY CASH FLOW | $ - | $ | - | $ | - | $ | - | $ | - | $ | (1,435,617) | $ | (40,000) | $ | 168,800 | $ | (3,521,366) | $ | (1,424,598) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| PORTFOLIO CASH BALANCE | $ - | $ | - | $ | - | $ | - | $ | (1,435,617) | $ | (1,475,617) | $ | (1,306,817) | $ | (4,828,183) | $ | (6,252,782) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|



| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| S-14 | O-14 | N-14 | D-14 | J-15 | F-15 | M-15 | A-15 | M-15 | J-15 | J-15 |
| 2,206 | 2,161 | 2,116 | 2,071 | 2,026 | 1,981 | 1,936 | 1,891 | 1,846 | 1,801 | 1,756 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| $ - | $ - | $ - | $ - | | | | | | | |
| $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 |
| $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 |
| $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 |
| $ (45,000) | $ (90,000) | $ (135,000) | $ (180,000) | $ (225,000) | $ (270,000) | $ (315,000) | $ (360,000) | $ (405,000) | $ (450,000) | $ (495,000) |
| $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| $ 2,251,000 | $ 2,206,000 | $ 2,161,000 | $ 2,116,000 | $ 2,071,000 | $ 2,026,000 | $ 1,981,000 | $ 1,936,000 | $ 1,891,000 | $ 1,846,000 | $ 1,801,000 |
| $ 1,846,000 | | | | | | | | | | |
| $ 304,590 | $ 74,250 | | | | | | | | | |
| $ 60,918 | | | | | | | | | | |
| $ 172,200 | | | | | | | | | | |
| 540,000 | $ - | $ - | $ - | | | | | | | |
| $ (2,423,708) | $ (74,250) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| $ 46,326 | $ 45,381 | $ 44,436 | $ 43,491 | $ 42,546 | $ 41,601 | $ 40,656 | $ 39,711 | $ 38,766 | $ 37,821 | $ 36,876 |
| $ 90,040 | $ 88,240 | $ 86,440 | $ 84,640 | $ 82,840 | $ 81,040 | $ 79,240 | $ 77,440 | $ 75,640 | $ 73,840 | $ 72,040 |
| $ (136,366) | $ (133,621) | $ (130,876) | $ (128,131) | $ (125,386) | $ (122,641) | $ (119,896) | $ (117,151) | $ (114,406) | $ (111,661) | $ (108,916) |
| $ (2,560,074) | $ (207,871) | $ (130,876) | $ (128,131) | $ (125,386) | $ (122,641) | $ (119,896) | $ (117,151) | $ (114,406) | $ (111,661) | $ (108,916) |
| $ (309,074) | $ 1,998,129 | $ 2,030,124 | $ 1,987,869 | $ 1,945,614 | $ 1,903,359 | $ 1,861,104 | $ 1,818,849 | $ 1,776,594 | $ 1,734,339 | $ 1,692,084 |
| $ (6,561,856) | $ (4,563,727) | $ (2,533,603) | $ (545,734) | $ 1,399,880 | $ 3,303,239 | $ 5,164,343 | $ 6,983,192 | $ 8,759,786 | $ 10,494,125 | $ 12,186,209 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A-15 | S-15 | O-15 | N-15 | D-15 | J-16 | F-16 | M-16 | A-16 | M-16 | J-16 |
| 1,711 | 1,666 | 1,532 | 1,398 | 1,264 | 1,130 | 996 | 862 | 728 | 594 | 457 |
| 0 | 89 | 89 | 89 | 89 | 89 | 89 | 89 | 89 | 72 | 0 |
| 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 |
| $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 |
| $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 |
| $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 |
| | $ 8,907,814 | $ 8,907,814 | $ 8,907,814 | $ 8,907,814 | $ 8,907,814 | $ 8,907,814 | $ 8,907,814 | $ 8,907,814 | $ 9,208,078 | $ - |
| | | $ - | $ - | $ - | $ - | $ - | $ - | | | |
| $ (540,000) | $ (585,000) | $ (630,000) | $ (675,000) | $ (720,000) | $ (765,000) | $ (810,000) | $ (855,000) | $ (900,000) | $ (945,000) | $ (990,000) |
| $ - | $ (89,000) | $ (178,000) | $ (267,000) | $ (356,000) | $ (445,000) | $ (534,000) | $ (623,000) | $ (712,000) | $ (804,000) | $ (804,000) |
| $ 1,756,000 | $ 10,529,814 | $ 10,395,814 | $ 10,261,814 | $ 10,127,814 | $ 9,993,814 | $ 9,859,814 | $ 9,725,814 | $ 9,591,814 | $ 9,755,078 | $ 502,000 |
| $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| $ 35,931 | $ 34,986 | $ 32,172 | $ 29,358 | $ 26,544 | $ 23,730 | $ 20,916 | $ 18,102 | $ 15,288 | $ 12,474 | $ 9,597 |
| $ 70,240 | $ 64,880 | $ 59,520 | $ 54,160 | $ 48,800 | $ 43,440 | $ 38,080 | $ 32,720 | $ 27,360 | $ 21,880 | $ 20,080 |
| $ (106,171) | $ (99,866) | $ (91,692) | $ (83,518) | $ (75,344) | $ (67,170) | $ (58,996) | $ (50,822) | $ (42,648) | $ (34,354) | $ (29,677) |
| $ (106,171) | $ (99,866) | $ (91,692) | $ (83,518) | $ (75,344) | $ (67,170) | $ (58,996) | $ (50,822) | $ (42,648) | $ (34,354) | $ (29,677) |
| $ 1,649,829 | $ 10,429,948 | $ 10,304,122 | $ 10,178,296 | $ 10,052,470 | $ 9,926,644 | $ 9,800,818 | $ 9,674,992 | $ 9,549,166 | $ 9,720,724 | $ 472,323 |
| $ 13,836,038 | $ 24,265,986 | $ 34,570,109 | $ 44,748,405 | $ 54,800,875 | $ 64,727,510 | $ 74,528,337 | $ 84,203,330 | $ 93,752,496 | ########## | ########## |

|  |  |  |  | TOTALS |  |
|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 804 | SOLD PROPERTIES |
| 45 | 45 | 45 | 45 | 1,260 | FORECLOSED PROPERTIES |

| | | | | | |
|---|---|---|---|---|---|
| $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 1,396,000 | $ 37,682,693 | |
| $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 13,050,000 | |
| $ 450,000 | $ 450,000 | $ 450,000 | $ 450,000 | $ 12,150,000 | |

| | | | | | |
|---|---|---|---|---|---|
| $ (1,035,000) | $ (1,080,000) | $ (1,125,000) | $ (1,170,000) | $ (15,885,000) | |
| $ (804,000) | $ (804,000) | $ (804,000) | $ (804,000) | $ (8,028,000) | |

| $ 457,000 | $ 412,000 | $ 367,000 | $ 322,000 | $ 320,625,982 | GROSS REVENUE |
|---|---|---|---|---|---|

| $ - | $ - | $ - | $ - | | |
|---|---|---|---|---|---|
| $ 8,652 | $ 7,707 | $ 6,762 | $ 5,817 | | |
| $ 18,280 | $ 16,480 | $ 14,680 | $ 12,880 | | |
| $ (26,932) | $ (24,187) | $ (21,442) | $ (18,697) | | |
| $ (26,932) | $ (24,187) | $ (21,442) | $ (18,697) | $ (15,216,698) | DIRECT EXPENSES |
| $ 430,068 | $ 387,813 | $ 345,558 | $ 303,303 | $ 105,412,284 | NET REVENUE |
| | | | $ 105,412,284 | | |

# **EXHIBIT H**

**Colgan Financial Group Inc.**
**265 Post Road West**
**Westport, CT 06880**


First 100, LLC
Joel Just, President
11920 Southern Highlands Parkway
Suite 200
Las Vegas, NV 89141

      RE:    Profit Sharing Increase to 5%

Gentlemen:

Pursuant section 2 of Amendment #1 and in accordance with the payout provisions of
Amendment #2, I am hereby advising First 100 and requesting acceptance that the Carry
Percentage for Colgan Financial Group on the Poinciana Portfolio is hereby increased by 1% to a
total of 5%.

If the foregoing accurately reflects our understanding of the previously executed documents
between our firms, please so indicate in the space designated below.


            Sincerely,

            Colgan Financial Group Inc.

            Robert Colgan
            President


Accepted and Agreed:
First 100, LLC

Joel Just
President

**EXHIBIT I**



LEVETT ROCKWOOD
——————— P.C. ———————
Attorneys-at-Law

CHRISTOPHER M. GRAHAM
cgraham@levettrockwood.com

April 30, 2014

**By FedEx**
First 100, LLC
11920 Southern Highlands Parkway – Suite 210
Las Vegas, NV  89141
Attn:   Mr. Jay Bloom
         Mr. Joel Just
         Mr. Matthew S. Farkas

Re:   Notice of Events of Default

Gentlemen:

We are counsel to Colgan Financial Group, Inc. ("Lender").  Lender and First 100, LLC ("Borrower") are parties to that certain Loan and Security Agreement dated as of December 20, 2013, as amended by Amendment No. 1 ("Amendment No. 1") dated as of February 14, 2014 (as amended, the "Loan and Security Agreement").  Capitalized terms used but not defined in this letter shall have the meanings set forth in the Loan and Security Agreement.  Section references are to sections of the Loan and Security Agreement unless otherwise specified.

On behalf of Lender, we are writing to notify Borrower that there have occurred and are continuing multiple uncured Events of Default under the Loan and Security Agreement.  Borrower, among other things, is in default of its payment obligations under Amendment No. 1, which provides that multiple payments were due on or before April 20, 2014, including the ROI Payment $150,000 originally due on January 20, 2014, the Principal Funding Amount originally due on February 20, 2014, the ROI Payment originally due on February 20, 2014, and the ROI Payment originally due on March 20, 2014 and the ROI payment due on April 20, 2014.  Borrower is in default of each of these payment obligations.  In addition, Lender believes that there may have been other violations of the Loan and Security Agreement and Lender is in the process of documenting these violations.

Pursuant to Section 5.2(a) of the Loan and Security Agreement, Lender hereby provides notice of the exercise of its option to accelerate the maturity of the Secured Obligations, as of the earliest of the Events of Default, and all of which are now due and payable.  Pursuant to Section 3 of the Promissory Note, interest has been and will continue to accrue in accordance with the

{Client Files/CMG/LTR/00266099.DOCX}

33 RIVERSIDE AVENUE
WESTPORT, CONNECTICUT 06880

TEL: (203) 222-0885
FAX: (203) 226-8025

First 100, LLC                           -2-                        April 30, 2014

terms set forth therein.  Lender hereby demands immediate payment in full of the Secured Obligations, including but not limited to accrued interest and the costs and expenses incurred by Lender enforcing its rights under the Loan and Security Agreement.  Payment may be made to the account specified on Exhibit A by wire transfer.

In addition, Lender hereby demands that Borrower immediately:

- cease and desist further violations of the Loan and Security Agreement, including but not limited to the ceasing the sale of Collateral and making a restricted payments in violation of the Loan and Security Agreement; and

- provide Lender access to Borrower's corporate books and financial records as set forth in Section 4.8 of the Loan and Security Agreement and deliver to Lender the financial statements and reports required pursuant to Section 4.5 of the Loan and Security Agreement, including without limitation a complete and detailed accounting of the Collateral sold by Borrower since December 20, 2013.

Lender intends to inspect Borrower's books and records forthwith and will contact you regarding the date and time of such inspection.

Please contact us immediately to address the matters set forth above.

This letter is sent without prejudice and Lender hereby expressly reserves all rights and remedies set forth in the Loan and Security Agreement and otherwise at law and in equity.

                                        Sincerely,

                                        Christopher M. Graham

CMG:lec

cc:    John Lasala, Esq.
       Colgan Financial Group, Inc.

{Client Files/CMG/LTR/00266099.DOCX}

Exhibit A
Wire Transfer Instructions:

PEOPLE'S UNITED BANK
Wire/ACH Transfer Instructions

FOR WIRES & ACH TRANSFERS

| | |
|---|---|
| Bank: | People's United Bank |
| Bank Address: | 119 East Putnam Avenue, Cos Cob, CT 06807 |
| Account Name: | Colgan Financial Group Inc. |
| Routing No: | 221172186 |
| Account No: | ▬▬▬▬ |
| Company Address: | 265 Post Rd West, Westport, CT 06880 |

If you have any questions, please call Lender

{Client Files/CMG/LTR/00266099.DOCX}

Exhibit B
Wire Transfer Instructions:


PEOPLE'S UNITED BANK
Wire/ACH Transfer Instructions

FOR WIRES & ACH TRANSFERS

Bank:                    People's United Bank
Bank Address:            119 East Putnam Avenue, Cos Cob, CT 06807
Account Name:            Colgan Financial Group Inc.
Routing No:              221172186
Account No:              ████████
Company Address:         265 Post Rd West, Westport, CT 06880

If you have any questions, please call Lender at 203-454-1484

{Client Files/CMG/LTR/00266101.DOCX}

## EXHIBIT J



LEVETT ROCKWOOD
——————— P.C. ———————
Attorneys-at-Law

CHRISTOPHER M. GRAHAM
cgraham@levettrockwood.com

April 30, 2014

**By FedEx**

Mr. Jay Bloom
c/o First 100, LLC
11920 Southern Highlands Parkway, Suite 200
Las Vegas, NV  89141

Re:      Notice of Events of Default

Dear Mr. Bloom:

     We are counsel to Colgan Financial Group, Inc. ("Lender").  Lender and First 100, LLC ("Borrower") are parties to that certain Loan and Security Agreement dated as of December 20, 2013, as amended by Amendment No. 1 ("Amendment No. 1") dated as of February 14, 2014 (as amended, the "Loan and Security Agreement").

     You are party to that certain Guaranty in favor of Lender dated as of December 20, 2013 (the "Guaranty") pursuant to which you have guaranteed $750,000 of the amounts owed by Borrower to Lender pursuant to the Promissory Note as set forth therein, in addition to all costs and expenses incurred by Lender in connection with the enforcement of the Guaranty.  Borrower is in default under that certain Loan and Security Agreement, including but not limited to payment default, as described in more detail in that certain Notice of Events of Default dated April 30, 2014 attached hereto as Exhibit A.

     Pursuant to the Guaranty, Lender hereby demands immediate payment of $750,000 pursuant to the wire transfer instructions attached hereto as Exhibit B.

{Client Files/CMG/LTR/00266101.DOCX}

33 RIVERSIDE AVENUE
WESTPORT, CONNECTICUT 06880

TEL: (203) 222-0885
FAX: (203) 226-8025

Mr. Jay Bloom                        -2-                        April 30, 2014

      This letter is sent without prejudice and Lender hereby expressly reserves all rights and remedies set forth in the Loan and Security Agreement, the Guaranty and otherwise at law and in equity.

<div style="text-align: right;">Sincerely,</div>

Christopher M. Graham

CMG:lec

cc:   John Lasala, Esq.
      Colgan Financial Group, Inc.

{Client Files/CMG/LTR/00266101.DOCX}

Exhibit A
Notice of Events of Default



**LEVETT ROCKWOOD**
——— P.C. ———
Attorneys-at-Law

CHRISTOPHER M. GRAHAM
cgraham@levettrockwood.com

April 30, 2014

***By FedEx***
First 100, LLC
11920 Southern Highlands Parkway – Suite 210
Las Vegas, NV  89141
Attn:   Mr. Jay Bloom
            Mr. Joel Just
            Mr. Matthew S. Farkas

Re:      <u>Notice of Events of Default</u>

Gentlemen:

      We are counsel to Colgan Financial Group, Inc. ("Lender").  Lender and First 100, LLC ("Borrower") are parties to that certain Loan and Security Agreement dated as of December 20, 2013, as amended by Amendment No. 1 ("Amendment No. 1") dated as of February 14, 2014 (as amended, the "Loan and Security Agreement").  Capitalized terms used but not defined in this letter shall have the meanings set forth in the Loan and Security Agreement.  Section references are to sections of the Loan and Security Agreement unless otherwise specified.

      On behalf of Lender, we are writing to notify Borrower that there have occurred and are continuing multiple uncured Events of Default under the Loan and Security Agreement. Borrower, among other things, is in default of its payment obligations under Amendment No. 1, which provides that multiple payments were due on or before April 20, 2014, including the ROI Payment $150,000 originally due on January 20, 2014, the Principal Funding Amount originally due on February 20, 2014, the ROI Payment originally due on February 20, 2014, and the ROI Payment originally due on March 20, 2014 and the ROI payment due on April 20, 2014. Borrower is in default of each of these payment obligations.  In addition, Lender believes that there may have been other violations of the Loan and Security Agreement and Lender is in the process of documenting these violations.

      Pursuant to Section 5.2(a) of the Loan and Security Agreement, Lender hereby provides notice of the exercise of its option to accelerate the maturity of the Secured Obligations, as of the earliest of the Events of Default, and all of which are now due and payable.  Pursuant to Section 3 of the Promissory Note, interest has been and will continue to accrue in accordance with the

{Client Files/CMG/LTR/00266099.DOCX}

First 100, LLC                             -2-                         April 30, 2014

terms set forth therein.  Lender hereby demands immediate payment in full of the Secured Obligations, including but not limited to accrued interest and the costs and expenses incurred by Lender enforcing its rights under the Loan and Security Agreement.  Payment may be made to the account specified on Exhibit A by wire transfer.

In addition, Lender hereby demands that Borrower immediately:

- cease and desist further violations of the Loan and Security Agreement, including but not limited to the ceasing the sale of Collateral and making a restricted payments in violation of the Loan and Security Agreement; and

- provide Lender access to Borrower's corporate books and financial records as set forth in Section 4.8 of the Loan and Security Agreement and deliver to Lender the financial statements and reports required pursuant to Section 4.5 of the Loan and Security Agreement, including without limitation a complete and detailed accounting of the Collateral sold by Borrower since December 20, 2013.

Lender intends to inspect Borrower's books and records forthwith and will contact you regarding the date and time of such inspection.

Please contact us immediately to address the matters set forth above.

This letter is sent without prejudice and Lender hereby expressly reserves all rights and remedies set forth in the Loan and Security Agreement and otherwise at law and in equity.

Sincerely,

Christopher M. Graham

CMG:lec

cc:   John Lasala, Esq.
      Colgan Financial Group, Inc.

{Client Files/CMG/LTR/00266099.DOCX}

Exhibit A
<u>Wire Transfer Instructions:</u>

PEOPLE'S UNITED BANK
Wire/ACH Transfer Instructions

FOR WIRES & ACH TRANSFERS

| | |
|---|---|
| Bank: | People's United Bank |
| Bank Address: | 119 East Putnam Avenue, Cos Cob, CT 06807 |
| Account Name: | Colgan Financial Group Inc. |
| Routing No: | 221172186 |
| Account No: | |
| Company Address: | 265 Post Rd West, Westport, CT 06880 |

If you have any questions, please call Lender

**EXHIBIT K**



## LEVETT ROCKWOOD
### ——— P.C. ———
#### Attorneys-at-Law

CHRISTOPHER M. GRAHAM
cgraham@levettrockwood.com

April 30, 2014

**By FedEx**

Mr. Matthew S. Farkas
c/o First 100, LLC
11920 Southern Highlands Parkway, Suite 200
Las Vegas, NV  89141

Re:   Notice of Events of Default

Dear Mr. Farkas:

    We are counsel to Colgan Financial Group, Inc. ("Lender").  Lender and First 100, LLC ("Borrower") are parties to that certain Loan and Security Agreement dated as of December 20, 2013, as amended by Amendment No. 1 ("Amendment No. 1") dated as of February 14, 2014 (as amended, the "Loan and Security Agreement").

    You are party to that certain Guaranty in favor of Lender dated as of December 20, 2013 (the "Guaranty") pursuant to which you have guaranteed $750,000 of the amounts owed by Borrower to Lender pursuant to the Promissory Note as set forth therein, in addition to all costs and expenses incurred by Lender in connection with the enforcement of the Guaranty.  Borrower is in default under that certain Loan and Security Agreement, including but not limited to payment default, as described in more detail in that certain Notice of Events of Default dated April 30, 2014 attached hereto as Exhibit A.

    Pursuant to the Guaranty, Lender hereby demands immediate payment of $750,000 pursuant to the wire transfer instructions attached hereto as Exhibit B.

{Client Files/CMG/LTR/00266183.DOCX}

33 RIVERSIDE AVENUE
WESTPORT, CONNECTICUT 06880

TEL: (203) 222-0885
FAX: (203) 226-8025

Mr. Matthew S. Farkas                    -2-                         April 30, 2014

    This letter is sent without prejudice and Lender hereby expressly reserves all rights and remedies set forth in the Loan and Security Agreement, the Guaranty and otherwise at law and in equity.

                                            Sincerely,

                                            Christopher M. Graham

CMG:lec

cc:    John Lasala, Esq.
       Colgan Financial Group, Inc.

{Client Files/CMG/LTR/00266183.DOCX}

Exhibit A
Notice of Events of Default



LEVETT ROCKWOOD
————— P.C. —————
Attorneys-at-Law

CHRISTOPHER M. GRAHAM
cgraham@levettrockwood.com

April 30, 2014

**By FedEx**
First 100, LLC
11920 Southern Highlands Parkway – Suite 210
Las Vegas, NV 89141
Attn:   Mr. Jay Bloom
        Mr. Joel Just
        Mr. Matthew S. Farkas

Re:   <u>Notice of Events of Default</u>

Gentlemen:

    We are counsel to Colgan Financial Group, Inc. ("Lender").  Lender and First 100, LLC
("Borrower") are parties to that certain Loan and Security Agreement dated as of December 20,
2013, as amended by Amendment No. 1 ("Amendment No. 1") dated as of February 14, 2014 (as
amended, the "Loan and Security Agreement").  Capitalized terms used but not defined in this
letter shall have the meanings set forth in the Loan and Security Agreement.  Section references
are to sections of the Loan and Security Agreement unless otherwise specified.

    On behalf of Lender, we are writing to notify Borrower that there have occurred and are
continuing multiple uncured Events of Default under the Loan and Security Agreement.
Borrower, among other things, is in default of its payment obligations under Amendment No. 1,
which provides that multiple payments were due on or before April 20, 2014, including the ROI
Payment $150,000 originally due on January 20, 2014, the Principal Funding Amount originally
due on February 20, 2014, the ROI Payment originally due on February 20, 2014, and the ROI
Payment originally due on March 20, 2014 and the ROI payment due on April 20, 2014.
Borrower is in default of each of these payment obligations.  In addition, Lender believes that
there may have been other violations of the Loan and Security Agreement and Lender is in the
process of documenting these violations.

    Pursuant to Section 5.2(a) of the Loan and Security Agreement, Lender hereby provides
notice of the exercise of its option to accelerate the maturity of the Secured Obligations, as of the
earliest of the Events of Default, and all of which are now due and payable.  Pursuant to Section
3 of the Promissory Note, interest has been and will continue to accrue in accordance with the

{Client Files/CMG/LTR/00266099.DOCX}

First 100, LLC                                -2-                                April 30, 2014

terms set forth therein.  Lender hereby demands immediate payment in full of the Secured Obligations, including but not limited to accrued interest and the costs and expenses incurred by Lender enforcing its rights under the Loan and Security Agreement.  Payment may be made to the account specified on Exhibit A by wire transfer.

     In addition, Lender hereby demands that Borrower immediately:

-   cease and desist further violations of the Loan and Security Agreement, including but not limited to the ceasing the sale of Collateral and making a restricted payments in violation of the Loan and Security Agreement; and

-   provide Lender access to Borrower's corporate books and financial records as set forth in Section 4.8 of the Loan and Security Agreement and deliver to Lender the financial statements and reports required pursuant to Section 4.5 of the Loan and Security Agreement, including without limitation a complete and detailed accounting of the Collateral sold by Borrower since December 20, 2013.

     Lender intends to inspect Borrower's books and records forthwith and will contact you regarding the date and time of such inspection.

     Please contact us immediately to address the matters set forth above.

     This letter is sent without prejudice and Lender hereby expressly reserves all rights and remedies set forth in the Loan and Security Agreement and otherwise at law and in equity.

                     Sincerely,

                     Christopher M. Graham

CMG:lec

cc:   John Lasala, Esq.
       Colgan Financial Group, Inc.

Exhibit A
Wire Transfer Instructions:

PEOPLE'S UNITED BANK
Wire/ACH Transfer Instructions

FOR WIRES & ACH TRANSFERS

| | |
|---|---|
| Bank: | People's United Bank |
| Bank Address: | 119 East Putnam Avenue, Cos Cob, CT 06807 |
| Account Name: | Colgan Financial Group Inc. |
| Routing No: | 221172186 |
| Account No: | ███████ |
| Company Address: | 265 Post Rd West, Westport, CT 06880 |

If you have any questions, please call Lender

{Client Files/CMG/LTR/00266099.DOCX}

Exhibit B
Wire Transfer Instructions:


PEOPLE'S UNITED BANK
Wire/ACH Transfer Instructions

FOR WIRES & ACH TRANSFERS

Bank:                    People's United Bank
Bank Address:            119 East Putnam Avenue, Cos Cob, CT 06807
Account Name:            Colgan Financial Group Inc.
Routing No:              221172186
Account No:              ▮▮▮▮▮▮▮▮
Company Address:         265 Post Rd West, Westport, CT 06880

If you have any questions, please call Lender at 203-454-1484

{Client Files/CMG/LTR/00266183.DOCX}

**EXHIBIT L**

## FORBEARANCE AGREEMENT

This Forbearance Agreement ("Agreement"), dated as of May 14, 2014, between and among Colgan Financial Group Inc., a Connecticut corporation ("Lender"), First 100, LLC, a Nevada limited liability company ("Borrower"), and Jay Bloom and Matthew Farkas (each, a "Guarantor" and together the "Guarantors").

WHEREAS, Borrower and Lender entered into a Loan and Security Agreement, dated December 20, 2013 and in connection therewith, also entered into a Short Term Original Issue Discount Promissory Note (the "Note"), and Equity Profit Sharing Agreement (the "Profit Sharing Agreement"), each dated December 20, 2013, as amended by Amendment No. 1 ("Amendment No. 1") dated as of February 14, 2014 (as amended, the "Loan Agreement");

WHEREAS, the Profit Sharing Agreement was further amended by that certain Amendment No. 2 dated March 3, 2014 (references to the Profit Sharing Agreement include Amendment No. 1 and such Amendment No. 2);

WHEREAS, each Guarantor entered into a Guaranty (each, a "Guaranty" and together, the "Guarantees") dated December 20, 2013 pursuant to which each Guarantor guaranteed the full and final payment of $750,000 to Lender, in addition to all costs and expenses incurred by Lender in connection with the enforcement of such Guaranty;

WHEREAS, Borrower is in default under the terms of the Loan Agreement for the reasons set forth in that certain Notice of Events of Default dated April 30, 2014 provided by Lender's counsel to Borrower (the "Existing Defaults");

WHEREAS, as a result of the Existing Defaults, Lender is entitled to exercise all rights and remedies under the Loan Agreement and the other Loan Documents; and

WHEREAS, Borrower has requested that Lender forbear from exercising Lender's rights and remedies under the Loan Agreement and the other Loan Documents, and Lender has agreed to do so pursuant to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing premises, and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.   Defined Terms. All capitalized terms used herein and not otherwise expressly defined herein will have the respective meanings given to such terms in the Loan Agreement.

2.   Acknowledgments of Borrower and Guarantors. In order to induce Lender to enter into this Agreement and to grant the forbearance described herein, Borrower hereby acknowledges and agrees with Lender, and represents and warrants to Lender, as follows:

(a)   The recitals to this Agreement are true and correct in all material respects.

(b)   Borrower hereby confirms to Lender that Borrower is unconditionally indebted to the Lender for all amounts owed under the Loan Agreement, the Note and the Profit Sharing Agreement, and that Borrower has no claims, causes of action or counterclaims, whatsoever, in law or equity, in connection with such agreements. All notices required under the Loan Documents have been given by Lender or validly waived, and all rights and/or opportunities to cure related thereto have expired or lapsed.

(c)   As of the date hereof, the aggregate outstanding balance of the Loan is $1,650,000 (exclusive of any default interest and other amounts owed by Borrower pursuant to the Loan Agreement), plus expenses incurred by Lender as set forth in the Loan Documents. Such amount is validly owing by Borrower to Lender and is not subject to any right of offset, claim or counterclaim in favor of Borrower or any other person.

(d)   Borrower hereby confirms the grant in favor of the Lender of a continuing blanket lien and security interest in all of Borrower's assets and properties now owned or hereafter acquired, which for clarity includes all real property owned by Borrower and any of its affiliates, pursuant to the Loan Agreement. All of Borrower's assets, property and interests, including without limitation real property, are owned directly, beneficially and of record, by Borrower. For clarity, Borrower acknowledges that its contract and any and all related rights that Borrower may have relating to the right to acquire the LM Portfolio is included in the Collateral.

(e)   The Existing Defaults constitute a material adverse event in the borrowing relationship between Borrower and Lender, and, as a consequence of such Existing Defaults, Lender is entitled to exercise all rights and remedies available to it under the Loan Documents and otherwise, including without limitation the right to accelerate the Secured Obligations and liquidate the Collateral. Upon a foreclosure and liquidation of Collateral, which Borrower is obligated to commence at Lender's direction, unless otherwise directed by Lender in its sole discretion, the order of liquidation shall be as follows: first, deeds for which Lender holds a mortgage as provided herein; second, rights to assignments of HOA beneficial interest in lien proceeds; and third, any other assets as may be held by Borrower. Notwithstanding the order of the sale of any such Collateral, Borrower acknowledges and agrees that all proceeds from such sale are for the benefit of Lender and shall be applied first to the satisfaction of the Secured Obligations until satisfied in full.

2

(f)     As of the date hereof, and except for the Existing Default, there exists no Event of Default under the Loan Agreement or any of the other Loan Documents.

3.     Forbearance Agreement.  Although Lender has the right to exercise its rights under the Loan Agreement and the other Loan Documents and applicable law, Lender hereby agrees that it will forbear from exercising its rights and remedies against Borrower or any of the Collateral during the Forbearance Period (as defined below) so long as Borrower is in compliance with the following terms and conditions (the "Forbearance Covenant"): except for the Existing Default, Borrower must comply with all terms and conditions of the Loan Agreement and other Loan Documents and this Agreement, and no Event of Default or default or breach of this Agreement other than the Existing Defaults may occur or exist.

4.     Forbearance Period.  Lender's agreement to forbear as set forth in this Agreement will terminate upon the earlier of: (a) the failure of Borrower to comply with the Forbearance Covenant or to satisfy any of the Forbearance Conditions or (b) 5:00 PM PST on May 21, 2014. The period beginning on the effective date of this Agreement until the first of the foregoing events to occur will be referred to herein as the "Forbearance Period."  At any time after the termination of the Forbearance Period, Lender may exercise its rights and remedies against Borrower, which Borrower agrees will include the imposition of the default rate of interest as set forth in the Note from the earliest date of the first Event of Default under the Loan Agreement, or any of the Collateral pursuant to the Loan Agreement, any other Loan Documents or otherwise.  For clarity, Lender is not waiving and expressly reserves all right and remedies as set forth in the Loan Documents in the event that the Secured Obligations have not been satisfied in full prior to the completion of the Forbearance Period.

5.     Conditions Precedent to Effectiveness.  Lender's agreement to forbear as set forth in this Agreement will not become effective and is contingent upon satisfaction of each of the following conditions (the "Forbearance Conditions"):

(a)     Borrower has not made any payments to Leading Ventures Enterprise Matching since April 3, 2014.  Borrower shall not pay or declare any distributions or dividends to any of Borrower's members (exclusive of continuing payroll obligations to members other than Jay Bloom, Chris Morgando and Carlos Cardenas in amounts that have historically be paid), including LVEM.  Jay Bloom, Chris Morgando and Carlos Cardenas will not receive any payments from Borrower except for compensation not to exceed a payment of $1,500 per payroll period.

(b)     Borrower shall immediately cease sales of any Collateral, including any real property owned by Borrower, without the prior written consent of Lender, provided that during the Forbearance Period such consent is not to be unreasonably if the use and/or distribution of the proceeds from any such sale are subject to mutual consent of the Borrower and Lender.

3

Notwithstanding the foregoing, Lender's consent is hereby granted for the disclosed pending sale of 10105 Prattville, Las Vegas, NV and collection of the Turnberry, Tower 3 lien as set forth in this Section 5(b). All cash received by Borrower from such sale and collection will be applied as follows: First, from the pending sale of 10105 Prattville, Las Vegas, NV, $80,000 will be retained by Borrower to be used by Borrower to meet employee obligations and any remainder received will be paid to Lender and applied against the Secured Obligations; second, in the event that the Turnberry, Tower 3 lien going to foreclosure sale on May 15, 2014 is satisfied, all amounts of cash received by Borrower shall be paid to Lender upon receipt and applied to the Secured Obligations. Upon the termination of the Forbearance Period, should any Secured Obligation remain, any cash or other consideration from the sale, disposition, collection or realization of proceeds of any Collateral will require consent of Lender and the proceeds thereof shall be applied to the satisfaction of the Secured Obligations.

        (c)    Borrower has provided Lender a true and accurate a list of all of Borrower's bank accounts and related information. Borrower authorizes Lender to contact Bank of America and any other bank where Borrower maintains its bank accounts to investigate the availability of a deposit account control agreement and Borrower shall immediately take all actions and enter into such agreements as requested by Lender to enter into such an agreement upon confirming its availability. Borrower shall not open any bank accounts other than those disclosed pursuant to this Section 5(c).

        (d)    Borrower has provided Lender a true and accurate list of all real property owned by Borrower and shall provide copies of deeds for such property on or before May 15, 2014, including those properties currently under consideration for sale. Borrower acknowledges that all such real property (and any real property hereafter acquired) is Collateral under the Loan Agreement and in accordance with the Loan Agreement Borrower shall enter into mortgage agreements ("Mortgages") in favor of Lender with respect to all such real property upon request and Borrower shall immediately take all such actions and enter into all such documents and agreements as requested by Lender to put such Mortgages in place.

        (e)    Borrower has provided the organizational documents for 1st One Hundred Investment Pool #1, LLC ("F100 Investment Pool") in the data room and such documents are true and accurate. Borrower represents and warrants that F100 Investment Pool is wholly-owned by Borrower and, except for F100 Investment Pool, Borrower does not have any subsidiaries or affiliates. Borrower represents and warrants that F100 Investment Pool does not have any assets, including real property. Borrower shall not transfer any assets to F100 Investment Pool.

4

(f)    Prior to the close of business each business day, Borrower will provide a Lender with a list of all disbursements to be made the following day, and all such disbursements will be subject to Lender's prior written approval.

(g)    On or before May 15, 2014, each Guarantor will provide and certify as to the accuracy of updated personal financial statements, including information regarding real property owned each Guarantor. Upon request of Lender, each Guarantor will execute such documents and enter into such agreements as requested by Lender to provide collateral security for the performance of the obligations set forth in the Guaranty, including without limitation entering into mortgage agreements in favor of lender with respect to real property owned by each such Guarantor.

(h)    Borrower will provide prompt responses to ongoing information requests from Lender, including but not limited to information regarding Borrower's efforts to secure bridge and/or longer term financing. For clarity, as set forth in the Loan Agreement, all such bridge and/or long term financing shall provide for payment to Borrower in full of the Secured Obligations.

(i)    On or before May 15, 2014, Borrower shall (i) provide an accounting of Total Portfolio Income calculated in accordance with the Equity Profit Sharing Agreement and (ii) execute that certain Amendment No. 3 to Equity Profit Sharing Agreement dated May 14, 2014 in form and substance substantially as provided with this Agreement.

6.    Default Under this Agreement; Obligation to Cooperate.

(a)    Any failure by Borrower or any Guarantor to comply with any covenant or agreement contained in this Agreement, or the breach of any representation or warranty made by Borrower or Guarantor herein, will constitute an immediate Event of Default and, notwithstanding anything to the contrary that may be set forth in the Loan Documents, Lender shall not be required to give any notice or opportunity to cure any such immediate Event of Default.

(b)    Upon the occurrence of any such immediate Event of Default or the expiration of the Forbearance Period, Lender shall, and each Guarantor shall cause Lender to, take any such actions requested by Lender as set forth in Article 5 of the Loan Agreement for the purpose of enabling Lender to fully enforce its rights and remedies as set forth therein. Borrower and each Guarantor acknowledge and agree that Lender has materially relied on this covenant to assist and not interfere with Lender's exercise of its rights and remedies under the Loan Agreement and that Borrower and each Guarantor shall be jointly and severally liable for any damages suffered by Lender arising from or relating to a breach of this provision.

5

7.   Continuing Effect of Loan Agreement. Except as set forth herein, the Loan Documents will be and remain in full force and effect as originally written, and will constitute the legal, valid, binding and enforceable obligation of Borrower and Guarantors to Lender; provided, for clarity, the Forbearance Conditions and representations and warranties set forth above shall survive the termination of the Forbearance Period. Borrower and each Guarantor hereby restate, ratify, and reaffirm each and every term, condition representation and warranty heretofore made by it under or in connection with the execution and delivery of the Loan Agreement, as amended hereby, and the other Loan Documents, as fully as though such representations and warranties had been made on the date hereof and with specific reference to this Agreement and the Loan Documents.

8.   No Other Forbearance. Borrower acknowledges that (a) except as expressly set forth herein, Lender has not agreed to (and has no obligation whatsoever to discuss, negotiate or agree to) any restructuring, modification, amendment, waiver or forbearance with respect to the Loan Agreement or any of the terms of in any document related thereto, (b) no understanding with respect to any other restructuring, modification, amendment, waiver or forbearance with respect to the Loan Agreement or any of the terms thereof or of any document related thereto will constitute a legally binding agreement or contract, or have any force or effect whatsoever, unless and until reduced to writing and signed by an authorized representative of Borrower and Lender, and (c) the execution and delivery of this Agreement has not established any course of dealing between the parties hereto or created any obligation or agreement of Lender with respect to any future restructuring, modification, amendment, waiver or forbearance with respect to the Secured Obligations or any of the terms of the Loan Documents.

9.   Waiver and Release. To induce Lender to enter into this Agreement and grant the accommodations set forth herein, Borrower and each Guarantor (a) acknowledge and agree that no right of offset, defense, counterclaim, claim or objection exists in favor of Borrower against Lender arising out of or with respect to the Loan Agreement, any guaranty, any other Loan Document, the Secured Obligations, or any other arrangement or relationship between Lender and Borrower, and (b) releases, acquits, remises and forever discharges Lender and its affiliates and participants, and all of their past, present and future officers, directors, employees, agents, attorneys, representatives, successors and assigns, from any and all claims, demands, actions and causes of action, whether at law or in equity, whether now accrued or hereafter maturing, and whether known or unknown, which Borrower or either Guarantor now has or has had by reason of any manner, cause or things prior to and through the date of this Agreement with respect to matters arising out of or with respect to the Loan Agreement, any guaranty, any other Loan Document, the Secured Obligations, or any other arrangement or relationship between Lender and Borrower arising from or relating to any period prior to the date of this Agreement.

6

{Client Files/CMG/AGT/00266880.DOC ver 5}

10.    Fees and Expenses.  Borrower further agrees to pay to Lender on demand all costs and expenses of Lender in connection with the preparation, execution, delivery and enforcement of this Agreement and the other Loan Documents and any other transactions contemplated hereby and thereby, including, without limitation, the fees and out-of-pocket expenses of legal counsel to Lender.

11.    Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, will be deemed to be an original and all of which counterparts, taken together, will constitute but one and the same instrument.

12.    Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of the successors and permitted assigns of the parties hereto.

13.    Governing Law.  This Agreement will be governed by, and construed in accordance with, the laws of Connecticut.

[SIGNATURES ON NEXT PAGE]

{Client Files/CMO/AGT/00266880.DOC ver 5}

IN WITNESS WHEREOF, the parties hereto have executed this agreement intending to be legally bound as of May 14, 2014.

**First 100, LLC**

By: _____
     Name: Joel Just
     Title: President, First 100 LLC

**COLGAN FINACIAL GROUP INC.**

By: _____
     James Coyne
     Duly Authorized

**GUARANTORS:**

_____
Jay Bloom

_____
Matthew Farkas

8

**EXHIBIT M**

**First 100, LLC**
11920 Southern Highlands Parkway
Suite 200
Las Vegas, NV  89141


May 14, 2014


Colgan Financial Group, Inc.
Robert Colgan, President
265 Post Road West
Westport, CT  06880

      Re:    <u>Amendment No. 3 to Equity Profit Sharing Agreement</u>

Gentlemen:

      Colgan Financial Group Inc., a Connecticut corporation ("Lender"), and First 100, LLC, a Nevada limited liability company ("Borrower"), are parties to that certain Equity Profit Sharing Agreement dated December 20, 2013, as amended by that certain Amendment No. 1 ("Amendment No. 1") dated February 14, 2014 to the Profit Sharing Agreement and the Agreements (as defined in Amendment No. 1) and by that certain Amendment No. 2 dated March 3, 2014 (the "Profit Sharing Agreement;" for clarity, all references to the Profit Sharing Agreement shall include such amendments and this Amendment No. 3).  Now, therefore, for good and valuable consideration, including the covenants and conditions set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

      1.      The Carry Percentage is currently at 5% as defined in Amendment No. 1 and confirmed by letter agreement between the parties executed in April 2014.  Borrower hereby confirms to Lender that Borrower is unconditionally indebted to the Lender for all amounts owed under the Profit Sharing Agreement, and that Borrower has no claims, causes of action or counterclaims, whatsoever, in law or equity, against Lender.  Borrower hereby ratifies and reaffirms each and every term, condition representation and warranty heretofore made by it under or in connection with the execution and delivery of Profit Sharing Agreement.

      2.      Borrower shall not sell, exchange, lease, negotiate, pledge, assign or otherwise dispose of all or any portion of the Poinciana Portfolio (as defined in the Profit Sharing Agreement), or any related rights or assets, without providing at least ten (10) business days prior written notice to Lender, and Lender shall be paid at the closing of any such sale (regardless of the form of transaction) an amount equal to the then applicable Carry Percentage (currently 5%) multiplied by the gross sale price of the Poincianna Portfolio or any portion thereof so sold.  Borrower hereby acknowledges Lender's blanket lien and security interest on all of Borrower's assets and properties, including without limitation the Poinciana Portfolio and that certain Purchase and Sale Agreement (the "Poinciana Purchase Agreement") dated July 3, 2013 between Borrower and Association of Poinciana Villages, Inc.

3.      Borrower hereby irrevocably conveys, assigns and delivers to Borrower an undivided 5% interest in and to all of Borrower's right, title and interest in and to the Poinciana Purchase Agreement, including the Assets (as defined in the Purchase and Sale Agreement) and 5% of the Total Portfolio Income derived therefrom, which such amount shall be paid upon any realization directly to Lender from each law firm, collection agency or other third party collecting any such amounts prior to any distribution to Borrower.  Borrower shall provide irrevocable instructions acceptable to Lender to each such law firm, collection agency or other third party that (a) 5% of all amounts so collected shall be distributed directly to Lender pursuant to Lender's wire transfer instructions and (b) all non-attorney client privileged financial reports, documents and other information produced by any such law firm, collection agency or third party relating to such collections and the realization of proceeds from the Poinciana Portfolio shall be provided to Lender at such time as any such reports, documents or other information is provided to Borrower.  If Borrower receives any Total Portfolio Income notwithstanding the instructions set forth above, Borrower shall remit 5% of the Total Porfolio Income to Lender within two (2) days following receipt thereof.

4.      Borrower will maintain its books, accounts and records relating to the Poinciana Portfolio on the basis of GAAP accounting principles consistently applied, and shall permit Lender or Lender's representative to visit and inspect any of Borrower's properties, corporate books and financial records with respect to the Poinciana Portfolio for the purpose of verifying Borrower's compliance with the terms of the Profit Sharing Agreement. The cost of such inspection will be paid for by Lender in the event Borrwer has at all times complied with the terms of the Profit Sharing Agreement, and paid for by Borrower if it has not complied with the terms of the Profit Sharing Agreement at all times.  Without limiting the generality of the foregoing, Borrower will provide month end financial statements reporting the Total Portfolio Income from the Poinciana Portfolio in the spreadsheet format designated in Amendment No. 2, the 5% Carry Percentage due to Lender (which shall have been distributed directly to Lender pursuant to Section 3 above), any property sales and other collections or realization of proceeds and a balance sheet or financial condition of the Poinciana Portfolio.  Borrower has provided Lender with the true and complete information required pursuant to the Profit Sharing Agreement relating to the Poinciana Portfolio and the 5% of the Total Portfolio Income due Lender.

5.      (a)      It shall be a default under the Equity Profit Sharing Agreement if Borrower shall (i) fail to make any payment under this Agreement within two (2) days following its due date, including without limitation any such failure to make a payment arising from Borrower's failure to (A) deliver Lender's share of any proceeds that Borrower may have received relating to the Poinciana Portfolio or (B) direct the applicable recipient of any proceeds of the Poinciana Portfolio to pay such amounts directly to Lender as contemplated herein, or (ii) default in the performance of any of Borrower's other covenants or obligations set forth in the Equity Profit Sharing Agreement and such default continues for a period of five (5) days following notice of such breach from Lender.  The notice and cure periods set forth in Section 5(b) shall only apply to the first three (3) defaults by Borrower under such section

       (b)    If Borrower defaults under Section 5(a)(i) above, Borrower shall pay to Lender a late fee equal to the greater of 5% of the Total Portfolio Income per month or $5,000 per month for each month or partial month that the default has not been cured.  If Borrower defaults under Section 5(a)(ii) above, Borrower shall pay to Lender $5,000 as liquidated damages and $500 per day until the default has been remedied.

       6.    Borrower will take all such actions and execute all such documents as reasonably by Lender as are necessary for the consummation of the transactions contemplated by the Profit Sharing Agreement including assignment set forth in Section 3 above and the other amendments contemplated by this Agreement.

       7.    This Profit Sharing Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut without giving effect to any choice or conflict of law provision or rule (whether in the State of Connecticut or any other jurisdiction) that would cause the application of the laws of any other jurisdiction.  Borrower and Lender agree that the Federal and State courts of Connecticut shall be the exclusive forum for the resolution of any disputes related to the Profit Sharing Agreement or the performance by Borrower and Lender of their respective obligations hereto.  Borrower and Lender consent to such exclusive jurisdiction and agree to waive and not assert any objections to such jurisdiction, including those related to forum non conveniens.

       8.    The terms and conditions of the Profit Sharing Agreement shall remain the same and in full force and effect, except as specifically modified or replaced herein. The terms the Profit Sharing Agreement, as amended, shall be binding upon and shall inure to the benefit of the successors and assigns of the parties hereto. The Profit Sharing Agreement, as amended, supersedes all previous understandings and agreements between the parties, whether oral or written, with respect to the subject matter hereof.

       This Amendment No. 3 may be executed in any number of counterparts (including facsimile counterparts), each of which will be considered an original, and all of which, when taken together, will constitute one and the same instrument.

*[Signature page follows.]*

If the foregoing accurately reflects our agreement, please so indicate in the space designated below, at which time it will become our binding agreement.

Sincerely,

FIRST 100, LLC

By: Jay Blum
Its: Manager

Accepted and Agreed:
Colgan Financial Group, Inc.

James Coyne
Duly Authorized

{Client Files/CMG/AMD/00267225.DOC ver 2}